UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
UNITHAI MARITIME LIMITED,                :
                                         :
                    Plaintiff,           :    07 CV 5730 (BSJ)
                                         :
v.                                       :
                                         :
RP LOGISTICS PVT. LTD. and               :
R. PIYARELALL INTERNATIONAL              :
PVT. LTD.                                :
                    Defendants.          :
------------------------------------------------------------x

### DECLARATION OF LAWRENCE G. COHEN
### IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
### MOTION TO VACATE MARITIME ATTACHMENT

Lawrence G. Cohen declares as follows:

1.  I am a partner with the law firm of Vandeventer Black LLP, attorneys for the defendants, as well as a member in good standing of the bars of New York and Virginia and admitted to practice in this Honorable Court. I submit this Declaration in Support of Plaintiffs' Opposition to Defendants', RP Logistics Pvt. Ltd. ("RPL") and R. Piyarelall International Pvt. Ltd. ("RPI") (collectively referred to as "Defendants"), Motion to Vacate.

2.  The Defendants cannot be found within the Southern District of New York. Courts have enunciated a two-prong test to determine whether a defendant is "found within the district" for purposes of a Supplemental Rule B attachment: (1) can the foreign defendant be found within the district in terms of jurisdiction, and (2) can the defendant be found for service of process. *Seawind Compania, S.A. v. Crescent Line, Inc.,* 320 F.2d 580, 582 (2d Cir. 1963);

*Navieros Inter-Americanos v. M/V Vasilia Express,* 120 F.3d 304, 314-15 (1st Cir.1997). In other words, the defendant must be able to accept process as well as being "'engaged in sufficient activity in the district to subject it to jurisdiction even in the absence of a resident agent expressly authorized to accept process.'" *VTT Vulcan Petroleum v.Langham-Hill Petroleum, Inc.,* 684 F.Supp. 389 (S.D.N.Y.1988) quoting *Seawind,* 320 F.2d at 583.

3.   In *D/S A/S Flint v. Sabre Shipping Corp.,* 228 F.Supp. 384 (E.D.N.Y. 1964), the plaintiff had attached assets in the Eastern District belonging to the defendant, who maintained a place of business in the Southern District and conducted some business in the Eastern District. *Id.* at 385. In deciding whether to vacate the attachment, the district court looked only to the textual requirements of the statute providing for attachments: that the defendant could not be "found" within the district.[1] *Id.* at 387. A defendant could be "found" only if it was 1) subject to

---

[1] Supplemental Rule B now governs the requirements for maritime attachments. The 1920 and 1844 versions of Admiralty Rule 2 were Rule B's direct predecessors. The 1920 version of Rule 2 was, in relevant part, as follows:

> In suits *in personam* the mesne process shall be by a simple monition in the nature of a summons to appear and answer to the suit, or by a simple warrant of arrest of the person of the respondent in the nature of a capias, as the libellant may, in his libel or information pray for or elect; in either case with a clause therein to attach his goods and chattels, or credits and effects in the hands of the garnishees named in the libel to the amount sued for, if said respondent shall not be found within the District.

Admiralty Rules of 1920, Rule 2, 254 U.S. at 679. In 1844, its predecessor read:

> In suits in personam, the mesne process may be by a simple warrant of arrest of the person of the defendant in the nature of a capias, or by a warrant of arrest of the person of the defendant with a clause therein, that if he cannot be found, to attach his goods and chattels to the amount sued for, or if such property cannot be found, to attach his credits and effects to the amount sued for in the hands of the garnishees named therein; or, by a simple monition in the nature of a summons to appear and answer to the suit, as the libellant shall, in his libel or information, pray for, or elect.

Admiralty Rules of 1844, Rule 2, 44 U.S. (3 How.) at iii.

personal jurisdiction within the district and 2) capable of being served with process there. *Id.* Because the defendant's business presence in the Eastern District was sufficient to subject it to personal jurisdiction and because the defendant could be served there, the defendant could be "found" within the Eastern District, and the attachment was improper. *Id.* at 389-90.

4. *Antco Shipping Co. v. Yukon Compania Naviera, S.A.*, 318 F.Supp. 626 (S.D.N.Y.1970), presented a similar situation. As in *Flint*, the defendant sought to vacate an attachment because the defendant could be found within the district, this time the Southern District. *Id.* at 627. Because service of process could be served on Yukon's managing agent located within the state, the second element of the test was met. Likewise, because the conduct complained of took place within the Southern District, the defendant was subject to personal jurisdiction there. *Id.* at 629-30. Because both the jurisdictional and service requirements were met, the attachment was vacated.

5. The caselaw confirming the test articulated in *Flint* and *Antco* is ample. *See Excel Shipping Corp. v. Seatrain Int'l S.A.*, 584 F.Supp. 734 (E.D.N.Y.1984); *Constr. Exp. Enters., Uneca v. Nikki Mar. Ltd.*, 558 F.Supp. 1372 (S.D.N.Y.1983); *Atlas Chartering Servs., Inc. v. World Trade Group, Inc.*, 453 F.Supp. 861 (S.D.N.Y.1978); *Eng'g Equip. Co. v. S.S. Selene*, 446 F.Supp. 706 (S.D.N.Y.1978); \*442 *Andros Compania Maritima, S.A. v. Andre & Cie., S.A.*, 430 F.Supp. 88 (S.D.N.Y.1977); *E. Asiatic Co. v. Indomar, Ltd.*, 422 F.Supp. 1335 (S.D.N.Y.1976); *Reefer Express Lines Pty., Ltd. v. Petmovar, S.A.*, 420 F.Supp. 16 (S.D.N.Y.1976); *United States v. Cia. Naviera Cont'l S.A.*, 178 F.Supp. 561 (S.D.N.Y.1959); *Federazione Italiana Dei Consorzi Agrari v. Mandask Compania De Vapores, S.A.*, 158 F.Supp. 107 (S.D.N.Y.1957). In none of these cases, from the late 1950s to the mid-1980s, was the determinative question anything other than whether the defendant could be "found" within the district-in other words,

whether the textual requirements of the attachment rule were met. *See Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 439-442 (2d Cir. 2006).

6. A defendant corporation is found within jurisdiction of a federal district court if in the recent past it has conducted substantial commercial activities in the district and will probably continue to do so in the future. *United States v. Cia Naviera,* 178 F.Supp. 561 (S.D.N.Y.1959); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Such substantial business includes sending a vessel into the district. *Navieros Inter-Americanos, S.A. v. M/V Vasilia Express,* 120 F.3d 304, 315 (1st Cir.1997).

7. The Second Circuit has held that when a contract that is at issue in a law suit had been made and breached in a State, personal jurisdiction exists over the foreign defendant in that particular State. *See Seawind,* 320 F.2d at 583 (corporation's activities in making contract in New York and allegedly breaching it in New York made the corporation subject to suit in New York); *see also VTT Vulcan,* 684 F.Supp. at 392 (" *Seawind* stands for the proposition that where a contract, which is the subject of a lawsuit, has been made and allegedly breached in the jurisdiction where attachment is sought, the contract can provide continued 'jurisdictional presence' even after the defendant has physically terminated other contacts with the jurisdiction").

8. In addition, a forum selection clause provides a basis for exercise of *in personam* jurisdiction. See *M/S Bremen v. Zapata Off-Shore,* 407 U.S. 1, 9-10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (A forum-selection clause is tantamount to consent to jurisdiction in a particular forum); *Maritime Ventures Int'l Inc. v. Caribbean Trading & Fidelity, Ltd.* 689 F.Supp. 1340, 1348 (S.D.N.Y.1988), *recons. denied,* 722 F.Supp. 1032 (S.D.N.Y.1989) ("The Supreme Court has held that a federal court sitting in admiralty should give full effect to forum-selection

clauses").

9. Defendants cannot be found within the district in the jurisdictional sense because they have not conducted substantial commercial activities in the district, have not sent Vessels into the district, have not executed or breached contracts in the district, and there is no contractual privity with Plaintiff such that a forum selection clause exists whereby the parties consent to the jurisdiction of a particular court.

10. A party seeking a Rule B attachment must make a bona fide effort to find its adversary in the district, *Seawind*, 320 F.2d at 583, but it is not necessary that an exhaustive search be conducted. *Royal Swan Navigation Co. v. Global Container Lines, Ltd.*, 868 F.Supp. 599, 603 (S.D.N.Y.1994). The presence of a transient individual almost once a week at a certain office within the district has been held to be insufficient to satisfy the second prong of the test. *Royal Swan*, 868 F.Supp. at 603. In addition, the mere known presence of an agent authorized to accept process does not, by itself, preclude foreign attachment. *Antco Shipping Co. v. Yukon Compania Naviera*, 318 F.Supp. 626, 628 (S.D.N.Y.1970), citing *Seawind*, 320 F.2d at 583.

11. Plaintiff made reasonable efforts to find Defendants in the district, but Defendants' presence in the district is not sufficient to satisfy the second prong of the test. Therefore, because Defendants could not be found in this district for service of process, Defendants' motion to vacate the attachment should be denied. *See Bay Casino, LLC. v. M/V Royal Empress*, 20 F.Supp.2d 440, 450 -452 (E.D.N.Y. 1998).

12. However, even if a foreign defendant "is found to be within the district in the jurisdictional sense, its property is not immune from attachment." *Navieros*, 120 F.3d at 315, quoting *United States v. Cia. Naviera Continental S.A.*, 178 F.Supp. 561, 563-64 (S.D.N.Y.1959). The fact that the defendant is present in the jurisdictional sense will not suffice

if he cannot be found for service of process within the district (the second prong of the test). *Integrated Container Service, Inc. v. Starlines Container Shipping, Ltd.,* 476 F.Supp. 119, 122 (S.D.N.Y.1979). This is because Rule B's purpose is two-fold: (1) to assure defendant's appearance and (2) to assure satisfaction in case the suit is successful. A post-attachment appearance may later moot the first purpose, but it does not address the second. *Id.* (citing *Swift v. Compania Colombiana,* 339 U.S. 684, 693-95, 70 S.Ct. 861, 94 L.Ed. 1206 (1950)).

13.     In order to obtain personal jurisdiction over RPL and its alter-ego, RPI, and to obtain security for its maritime claim, Plaintiff commenced this action on June 14, 2007, by the filing of a Verified Complaint, which included a prayer for an Ex-Parte Order of Process of Maritime Attachment pursuant to Rule B [ of the Supplemental Rules for Certain Admiralty and Maritime Claims].

14.     On June 15, 2007, the Court issued an Ex-Parte Order of Maritime Attachment and Garnishment. The Ex-Parte Order authorized Plaintiff to attach Defendants' property located within this judicial district and belonging the Defendants up to the sum of $559,353.00.

15.     The Ex-Parte Order and Process of Maritime Attachment and Garnishment ("PMAG") named garnishee banks believed to have assets due and owing to the Defendants. The Ex-Parte Order and PMAG were served upon the garnishee banks, including Bank of America.

16.     Plaintiff claimed against both RPL and RPI in this action, as RPL is merely a shell corporation through which RPI and the "R. Piyarelall Group" as a whole conduct their chartering business.

17.     From common offices located at "REGENT HOUSE" 12, Govt. Place (East), Calcutta – 700 069, India, the R. Piyarelall Group operates a manufacturing, purchasing, sale and

transportation network which includes the transport and delivery of numerous goods.

18. The "R. Piyarellal Group" includes both of the Defendants, and is ultimately controlled by the Agarwal Family.

19. Upon information and belief, among the entities which comprise the "R. Piyarellal Group" there is a commonality of control and management centered with Mr. Ramesh Kumar Agarwal, and an overlap of officers, directors and employees.

20. RPI and R. Piyarellal Group dominate and control RPI such that they are actually carrying on their business through and as RPL.

21. The Defendants' funds in the amount of $430,898.44 are currently being restrained in response to the Ex-Parte Order and PMAG issued in the instant action.

22. OGI Oceangate Transportation Co. Ltd. ("OGI") was at all material times the disponent owner of the motor vessel "IKAL". Defendant RPL was the charterer of the M/V IKAL.

23. At all material times Defendant RPI was the alter-ego of RPL.

24. By a charter party dated June 21, 2006 OGI chartered the M/V IKAL to Defendant RPL.

25. RPL was the only charter named in the charter party contract. Although RPI has claimed RPL was its "broker" for the charter of the M/V IKAL, RPI never notified OGI of this relationship.

26. In late June/early July of 2006, OGI received a bill of lading issued by RPL's agent, Purba Bhartai Shipping Agency Pvt. Ltd. *See Unauthorized Bill of Lading annexed hereto as Exhibit "1."*

27. Upon OGI's inquiry, the Master of the M/V IKAL stated that RPL's agent, Purba

Bhartaati Shipping Agency Pvt. Ltd., was never authorized to issue a bill of lading at all. *See Forged Letter of Authorization from Master annexed hereto as Exhibit "2" and Letter from Master of the M/V IKAL stating that RPL's agent was never authorized to issue the bill of lading annexed hereto as Exhibit "3".* The only entity authorized by the Master to issue the bill of lading was Alfa Oceanic Shipping Services Pvt. Ltd. *See Letter of Authorization annexed hereto as Exhibit "4."*

28. On July 14, 2006 OGI's Chinese attorney sent a facsimile to RPL and the cargo owner, China National Minerals, stating that the M/V IKAL would arrive at the discharging port on July 16, 2006, but that 100% of the freight and dead freight remained unpaid. *See Letter from OGI's Chinese lawyer to RPL and China National Minerals annexed hereto as Exhibit "5."*

29. The letter further stated that unless OGI received the outstanding freight and dead freight by July 17, 2006, OGI would exercise a lien on the cargo.

30. OGI's lawyer also notified RPL and China National Minerals, the buyer of the cargo, that RPL's agent forged the Master's signature on the letter of the authorization, and that the unauthorized bill of lading issued pursuant to that letter would not be accepted.

31. On the same day, OGI also sent a similar message in respect of the unauthorized bill of lading to RPL, RRL's agent and China National Minerals. *See E-mail annexed hereto as Exhibit "6."*

32. On July 16, 2006 the Vessel arrived at Fangcheng, China. *See Laytime Statement of Facts annexed hereto as Exhibit "7."*

33. Despite due demand, RPL failed to pay OGI the freight, dead freight and demurrage due and owing under the charter party contract.

34. OGI instructed the Vessel not to berth unless OGI received the amounts due and

owing under the charter party.

35. After some negotiation, on July 22, 2006, an amicable agreement was reached between OGI and Defendants herein. OGI agreed that it would discharge the cargo upon receiving a payment in the amount of $45,000.00. The agreement was ultimately executed on July 24, 2006.

36. Discharging of the cargo aboard the M/V IKAL commenced Monday, July 24, 2006. *See Exhibit "7"*.

37. Discharing of the cargo aboard the M/V IKAL completed on Tuesday July 25, 2006. *See Exhibit "7."*

38. On July 31, 2006, OGI received from the Defendant RPI the payment in the amount of $45,000.00 due under the agreement.

39. Despite the fact that RPL was only named charterer, it was RPI that paid OGI the agreed $45,000.00.

40. There is no indication that RPI has made a claim or otherwise sought indemnification from RPL for this payment.

41. OGI sent an instruction to its agent in Fangcheng, China to release the cargo on August 1, 2006. In the instruction, OGI reminded the agent that the cargo must only be released upon presentation of the genuine, original bill of lading. *See Letter to Agent in Fangcheng and accompanying translation annexed hereto as Exhibit "8."*

42. On August 3, 2006, OGI sent another message to its agent in Fangcheng, China to push the consignee to take delivery. In light of the prior forged letter of authorization, OGI requested that its agent send it a copy of the bill of lading ultimately presented to the agent by the consignee so that it could be verified before the cargo was released. *See Letter of August 3, 2006*

*and accompanying translation annexed hereto as Exhibit "9."*

43. On August 11, 2006, OGI and its agent received a court order issued by the Behai Maritime Court of the Peoples Republic of China that had been obtained by the receiver, China National Metals, directing it to release the cargo. However, as the original bill of lading was never issued to Defendant RPL, the Chinese court's findings are circumspect.

44. As the Chinese proceeding was preliminary in nature, China National Metals had only: (1) to allege minimal facts to support its case; and (2) post security for any future damages in order to obtain the injunctive order. Thus, as the order was preliminary and based merely on the unfounded and unsubstantiated allegations of the cargo owner, China National Metals, it does not provide evidence in support of Defendants' claims.

45. Nevertheless, the cargo was released pursuant to the Chinese court's order. *See Chinese Court order and accompanying translation annexed hereto as Exhibit "10."*

46. Notably, the Chinese order states that it was in RPI, not RPL, that chartered the Vessel from OGI. *See Exhibit "10."*

47. While the settlement agreement was intended to cover all the dead freight and demurrage due and owing under the charter party for the M/V IKAL, RPL and RPI have repeatedly contested the validity of the agreement.

48. In September of 2006, RPL and RPI wrongfully and unlawfully arrested the motor vessel "UTHAI NAVEE" making various claims against OGI and inaccurately alleging that OGI had an interest in the Vessel. *See Defendants' Exhibit 5, Declaration C.R. Addy, Esquire, Exhibit A.*

49. OGI did not have an ownership interest in the "UTHAI NAVEE." Rather, OGI had chartered the "UTHAI NAVEE" from "Unithai Maritime Limited." *See Unithai-OGI*

*charter party annexed hereto as Exhibit "11."*

50. Furthermore, at the time of the arrest the "UTHAI NAVEE" was on charter to an entity name "Rockwell International Holding Ltd." *See OGI-Rockwell charter party annexed hereto as Exhibit "12."*

51. OGI contracted to charter the "UTHAI NAVEE" to an entity name Sino East Shipping Ltd. following the completion of the Rockwell charter. *See OGI-Sino East charter party annexed hereto as Exhibit "13."*

52. Due to RPL and RPI's unlawful and wrongful arrest, the "UTHAI NAVEE" missed its laycan for the Sino East Shipping Ltd. Charter and Unithai suffered substantial damages.

53. Unithai Line Public Co. Ltd. and OGI disputed the validity and legality of the arrest in India. Unithai Maritime Ltd., the Plaintiff herein, did not appear in the legal proceedings that occurred in India.

54. OGI also initially discussed posting security in order to obtain the release of the Vessel. However, Unithai Line Public Co. Ltd., the registered owner of the Vessel, appeared in the action and the arrest was lifted.

55. There is a three year statute of limitations for bringing a claim for wrongful arrest in the Indian courts.

56. As will be shown herein, RPI is an alter ego of RPL because it dominates and disregards RPL's corporate form to the extent that RPI is actually carrying on RPL's business and operations as if the same were its own.

57. In the Memorandum of Law, RPL and RPI maintain that they enjoy an arms length business relationship. For the reasons that follow, and based upon even a cursory review

of the attached exhibits, it is evident that RPL and RPI are alter egos of each other and the scenario presented by Defendants is, at best, a gross misrepresentation of the facts.

58.  RPL is a paper company used by RPI to charter ships such as the motor vessel IKAL.

59.  By chartering ships through a shell or pass through corporation, i.e. RPL, RPI and the "R. Piyarelall Group" can effectively insulate themselves from liability.

60.  Even without the benefit of discovery, numerous facts have come to light showing that RPI and RPL are one and the same.

61.  RPL and RPI have the exact same address: 1st floor, 12 Government Place (East), Kolkata 700069, West Bengal, India. *See letterhead of RPL and RPI annexed hereto as Exhibits "14" and "15" respectively.*

62.  RPL and RPI use the same telephone number: 91 033-2220-5907/2682. *See Exhibit "14" and Business Information Report on RPI annexed hereto as Exhibit "16."*

63.  RPL and RPI have an identical CABLE identifier: RAGHUPIYAR. *See Exhibits "14" and "15".*

64.  Investigative reports indicate that RPL and RPI have overlapping directors. Notably, the head of the "R. Piyarelall Group," Mr. Ramesh Agarwal, is a director of RPI and RPL. *See Business Reports of RPI and RPL annexed hereto as Exhibits "16" and "17" respectively.*

65.  In addition, RPL and RPI share Mr. Siddarth Agarwal as a director. *See Exhibits "16" and "17."*

66.  The Defendants state that they only have one director in common: Mr. Varun Agarwal. *See Affidavit of Owen Duffy ¶21.* However, according to the documents submitted

with this Declaration and *Defendants' own Exhibits*, it is clear that Siddarth Agarwal is a director at both RPL and RPI. *See Defendants' Exhibits "10" and "15."*

67. The 2005 tax returns of RPL and RPI *were each signed and submitted by Mr. Siddarth Agarwal, who attests to the fact that he is the director of both RPL and RPI. See Defendants' Exhibits "10" and "15."*

68. In light of this patent contradiction between Defendants' statements and their actual documents, Defendants' "evidence" of corporate separateness should be given little or no weight.

69. The remaining director in RPL, Varun Agarwal, and in RPI, Mr. Suresh Agarwal, are clearly both members of the Agarwal family. Notably, Defendants concede that Mr. Varun Agarwal is a shared director. *See Affidavit of Owen Duffy*, ¶ 26.

70. The Agarwal family dominates the directorships of RPI, RPL and numerous other companies in the R. Piyarellal Group.

71. The organizational hierarchy of the "R. Piyarellal Group" as a whole is headed by Mr. Ramesh Kumar Agarwal, some of the late Shri Piyarellal Agarwal, who is assisted by his two younger brothers Mr. Suresh Kumar and Mr. Naresh Kumar Agarwal in carrying out the family business.

72. Siddharth, Varun and Karan Agarwal also act as representative of the "R. Piyrelall Group."

73. The alter-ego relationship between RPL and RPI is further evidenced by RPL's charter of the motor vessel "EPIC."

74. Pursuant to a charter party dated July 14, 2005, a company named Epic Navigation Company Ltd. chartered the motor vessel "EPIC" to RPL. *See Epic-RPL charter*

*party annexed hereto as Exhibit "18."*

75.  Despite the fact that RPL was the only named charterer, communications regarding the charter often originated from the *"R. Piyarellal Group." See E-mail communications originating from the "R. Piyarellal Group" annexed hereto as Exhibit "18."*

76.  Communications dealing with Defendant RPL's possible shortages under the "EPIC" charter party were sent and replied to by Siddharth Agarwal in numerous different guises and labels: the "R. Piyarellal Group," the Defendant RPL and/or an entity named R. Piyarellal Import and Export.

77.  In these communications, Siddarth Agarwal used the e-mail address for RPL, **cal@rpiyarelall.com**, and RPI, **cal@rpiyarelallgroup.com** interchangeably. *See Exhibit "18."*

78.  In the instant matter, where RPL purportedly sent a letter to RPI requesting it to pay amounts due under the charter, RPL's contract information has transformed into the exact information provided in RPI's letter head. *Compare Defendants' Exhibit 17 with Exhibit "15" annexed hereto.*

79.  It is ironic that a letter supposedly evidencing the arms-length transactions between RPL and RPI is coming from and going to *the exact same address, phone number* and *facsimile number.*

80.  In addition, RPI has made freight payments directly to OGI despite the fact that it was not named in the charter party contract. *See wire remittance details for RPL freight payment paid by RPI annexed hereto as Exhibit "19" and wire remittance details for RPI's $45,000.00 payment to OGI annexed hereto as Exhibit "20."*

81.  RPL has failed to submit any evidence showing that RPI actually paid a commission to RPL or that RPL received any consideration for its alleged broker services.

82. With the benefit of discovery, Plaintiff has no doubt that numerous other connections between RPL and RPI will be revealed.

83. Unithai Maritime Ltd., the Plaintiff herein, is a company incorporated under the appropriate laws of Singapore and having its registered office and carrying on business at 12-01 Suntec City, Tower 5, Temasek Boulevard, Singapore 038985. *See Affidavit of Owen Duffy, ¶ 6; see also Exhibit "2" attached to Affidavit of Owen Duffy.*

84. Unithai Line Public Co. Ltd. is a company incorporated under the appropriate laws of Thailand and having its registered office and carrying on business at 11th Floor, Alma Link Building, 25, Chidlom Road, Pimenchit, Patunwan, Bangkok 10330. *See Exhibit "F" at 2-3, attached to the Declaration of C.R. Addy, Esq., attached as Exhibit "5" to the Affidavit of Owen Duffy,*

85. Unithai Line Public Co. Ltd. made a special appearance, without submission to personal jurisdiction, in the High Court of Calcutta to obtain the release of the M/V UTHAI NAVEE from arrest that resulted due to the actions of Defendants herein. *See Declaration of Amit Basu annexed hereto as Exhibit 21; see also Exhibit "F" at 3, attached to the Declaration of C.R. Addy, Esq., attached as Exhibit "5" to the Affidavit of Owen Duffy,*

86. Neither the courts of India nor the courts of Hong Kong have personal jurisdiction over Unithai Maritime Ltd. Unithai Maritime Ltd. is not currently, and has not previously been, before the High Court of Calcutta. *See Affidavit of Owen Duffy, ¶ 100.* Furthermore, the parties are not more conveniently subject to the jurisdiction of either India or Hong Kong. *See Affidavit of Owen Duffy, ¶ 100.*

87. It is unclear at this point in the litigation what law would apply to the Plaintiff's cause of action for wrongful arrest. Regardless of whether the law of the United States of the

law of India applies, however, the result is the same: the arrest of the M/V UTHAI NAVEE was accomplished by Defendants in bad faith and/or gross negligence, thus the arrest was wrongful.

88.    The ex-parte arrest of the M/V UTHAI NAVEE was wrongful under the law of wrongful arrest as interpreted in the admiralty courts of the United States. *See, e.g., Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir.1937).

88.    Further, to the extent that the admiralty law of the United States does not govern the underlying cause of action for wrongful arrest, the provisions of the International Convention on the Arrest of Ships, Geneva, 1999 ("the Convention) are the applicable law. *See Declaration of Amit Basu annexed hereto as Exhibit 21; Report of the United Nations/International Maritime Organization Diplomatic Conference on Arrest of Ships annexed hereto as exhibit 22 at 8-17.* The Honorable Supreme Court of India, by the judgment reported in "M/V Elisabeth" A.I.R. 1993 S.C. 1014 has held that the principles incorporated in the Convention are part of the common law of India applicable for the enforcement of maritime claims against foreign ships.

88.    With regard to the arrest of sister ships, according to Article 3(2) an arrest is permissible of any other ship which, when the arrest is effected, is owned by the person who is liable for the maritime claims and who was, when the claim arose, either (a) owner of the ship in respect of which the maritime claim arose; or (b) demise charter, time charter or voyage charter of that ship. *See Report of the United Nations/International Maritime Organization Diplomatic Conference on Arrest of Ships annexed hereto as exhibit 22 at 10-11.* It is therefore necessary the any claim be directed against the "owner" of the particular vessel being arrested. Oceangate, not being the owner of the ship arrested, does not conform to the requirements necessary to justify an arrest of the M/V UTHAI NAVEE on the basis of a theory of a sister ship relationship between the M/V IKAL and the M/V UTHAI NAVEE.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 23, 2007.

_____

Lawrence G. Cohen

## AFFIRMATION OF SERVICE

I hereby certify that on July 23, 2007, a copy of the foregoing DECLARATION OF LAWRENCE G. COHEN IN SUPPORT OF PLAINTIFF"S OPPOSITION TO MOTION TO VACATE MARITIME ATTACHMENT was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: /s/ Lawrence G. Cohen
Lawrence G. Cohen