ATTORNEY'S AFFIDAVIT
IN SUPPORT OF MOTION TO VACATE
PROCESS OF MARITIME
ATTACHMENT

EXHIBIT 22

**United Nations/International Maritime Organization**



**Diplomatic Conference
on Arrest of Ships**

Distr.
GENERAL

A/CONF.188/5
19 July 1999

Original: ENGLISH

**REPORT OF THE
UNITED NATIONS/INTERNATIONAL MARITIME ORGANIZATION
DIPLOMATIC CONFERENCE ON ARREST OF SHIPS**

Held at the Palais des Nations, Geneva,
from 1 to 12 March 1999

GE.99-52443

- 2 -

# CONTENTS

| Chapter | | Page |
|---|---|---|
| I. | Final Act of the Diplomatic Conference . . . . . . . . . . . . . . . . . . . . . . | 3 |
| | International Convention on Arrest of Ships, 1999 . . . . . . . . . . . . . | 8 |
| II. | Preparation and adoption of a Convention on Arrest of Ships . . . . . | 18 |
| III. | Organizational matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |

**Annex**

Attendance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

- 3 -

## Chapter I

## FINAL ACT OF THE UNITED NATIONS/INTERNATIONAL MARITIME ORGANIZATION DIPLOMATIC CONFERENCE ON ARREST OF SHIPS

1.      The General Assembly of the United Nations, by resolution 52/182 of 18 December 1997, endorsed the convening of a Diplomatic Conference in order to consider and adopt a convention on arrest of ships.

2.      The United Nations/International Maritime Organization Diplomatic Conference on Arrest of Ships was convened at Geneva from 1 to 12 March 1999.

3.      Representatives from the following States participated in the Conference:  Algeria, Angola, Argentina, Australia, Belarus, Belgium, Benin, Brazil, Bulgaria, Burundi, Cameroon, Canada, Chile, China, Colombia, Côte d'Ivoire, Croatia, Cuba, Cyprus, Denmark, Dominican Republic, Ecuador, Egypt, El Salvador, Estonia, Ethiopia, Finland, France, Gabon, Gambia, Georgia, Germany, Ghana, Greece, Guinea, Haiti, Honduras, Hungary, India, Indonesia, Iran (Islamic Republic of), Iraq, Israel, Italy, Japan, Kenya, Latvia, Lebanon, Liberia, Lithuania, Madagascar, Malta, Marshall Islands, Mauritania, Mexico, Monaco, Morocco, Mozambique, Netherlands, Nigeria, Norway, Pakistan, Panama, Peru, Philippines, Poland, Portugal, Republic of Korea, Romania, Russian Federation, Senegal, Singapore, Slovakia, Slovenia, South Africa, Spain, Sri Lanka, Sudan, Sweden, Switzerland, Syrian Arab Republic, Thailand, Trinidad and Tobago, Tunisia, Turkey, Ukraine, United Arab Emirates, United Kingdom of Great Britain and Northern Ireland, United Republic of Tanzania, United States of America, Uruguay, Viet Nam, and Yemen.

4.      Hong Kong Special Administrative Region of China and Macao, associate members of the International Maritime Organization, were represented by  observers.

5.      The following intergovernmental organizations were represented by an observer: Arab Labour Organization, Organization of African Unity, Organization of American States, Organization of the Islamic Conference, Intergovernmental Organization for International Carriage by Rail.

6.      The following non-governmental organizations were represented by an observer: *general category*:  International Chamber of Commerce, International Confederation of Free Trade Unions, World Federation of United Nations Associations; *special category*: International Ship Suppliers Association, International Association of Ports and Harbours, Latin American Association of Navigational Law and Law of the Sea, International Chamber of Shipping, Comité Maritime International, Institute of International Container Lessors, Ibero-American Institute of Maritime Law, International Group of P&I Clubs, International Union for Conservation of Nature and Natural Resources.

- 4 -

7.     The Conference elected the following officers:

| President: | Mr. Zhu Zengjie | (China) |
|---|---|---|

| Vice-Presidents: | Mrs. Ida Barinova | (Russian Federation) |
|---|---|---|
| | Mr. Marc Gauthier | (Canada) |
| | Mr. Mykola Maimeskul | (Ukraine) |
| | Mr. Mahmoud Bahey Eldin Ibrahim Nasrah | (Egypt) |
| | Mr. Eladio Peñaloza | (Panama) |
| | Mr. Luigi Rovelli | (Italy) |
| | Mr. Lalchand K. Sheri | (Singapore) |

| Rapporteur-General: | Mr. Walter de Sa'Leitao | (Brazil) |
|---|---|---|

8.     The Conference established a Main Committee, a Drafting Committee and a Credentials Committee.

*Main Committee*

| Chairman: | Mr. K.J. Gombrii | (Norway) |
|---|---|---|

| Members: | open-ended |
|---|---|

*Drafting Committee*

| Chairman: | Mr. Malcolm J. Williams, Jr. | (United States of America) |
|---|---|---|

| Core members: | Algeria, Argentina, Belgium, China, Côte d'Ivoire, Croatia, Denmark, Egypt, France, Gambia, Germany, Ghana, Lithuania, Mexico, Russian Federation, Spain, Sri Lanka, Tunisia, Turkey, United Kingdom of Great Britain and Northern Ireland, and United States of America. |
|---|---|

*Credentials Committee*

| Chairman: | Ms. Sama Payman | (Australia) |
|---|---|---|

| Members: | Australia, Benin, Brazil, China, Haiti, Mozambique, Philippines, Russian Federation, United States of America. |
|---|---|

9.     The secretariat of the Conference included the following officers: Secretary-General of UNCTAD, Mr. Rubens Ricupero; Executive Secretary, Mr. Jean Gurunlian, Director, Division for Services Infrastructure for Development and Trade Efficiency, UNCTAD; Deputy Executive Secretary, Mrs. Rosalie Balkin, Director, Legal Affairs and External Relations Division, IMO; Mrs. Monica N. Mbanefo, Senior Deputy Director, IMO; Mr. Agustín Blanco-Bazán, Senior

- 5 -

Legal Officer, IMO; Ms. Mahin Faghfouri, Head, Legal Unit, SITE, UNCTAD; Mr. Carlos Moreno, Legal Officer, SITE, UNCTAD; Mr. Erik Chrispeels, Senior Legal Officer, UNCTAD; Mr. Awni Behnam, Secretary of the Conference, UNCTAD; Mr. Karma Tenzing, Deputy Secretary of the Conference, UNCTAD.

10.    The Conference had before it, as a basis for its work, the draft articles for a convention on arrest of ships[1], prepared by the Joint UNCTAD/IMO Intergovernmental Group of Experts on Maritime Liens and Mortgages and Related Subjects, and the compilation of comments and proposals by Governments, and by intergovernmental and non-governmental organizations, on the draft convention on arrest of ships[2]. The Conference adopted its rules of procedure[3] and its agenda.[4]

11.    On the basis of its deliberations as recorded in its report,[5] the Conference established the text of the INTERNATIONAL CONVENTION ON ARREST OF SHIPS, 1999.

12.    The text of the Convention was adopted by the Conference on 12 March 1999. The Convention will be open for signature at United Nations Headquarters, New York, from 1 September 1999 to and including 31 August 2000.

---

[1]    TD/B/IGE.1/5.

[2]    A/CONF.188/3 and Add.1-3.

[3]    A/CONF.188/2.

[4]    A/CONF.188/1.

[5]    A/CONF.188/5.

- 6 -

Done in Geneva, on this twelfth day of March, one thousand nine hundred and ninety-nine, in one original in the Arabic, Chinese, English, French, Russian and Spanish languages, all texts being equally authentic. The original of the Final Act shall be deposited in the archives of the United Nations Secretariat.


Zhu Zenjie
President of the Conference


R. Ricupero
Secretary-General of UNCTAD


J. Gurunlian
Executive Secretary of the Conference


R. Balkin
Deputy Executive Secretary of the Conference


M. Faghfouri
Head, Legal Unit, SITE


E. Chrispeels
Senior Legal Officer


A. Behnam
Secretary of the Conference

- 7 -

IN WITNESS WHEREOF the undersigned representatives have signed this Final Act.

The States whose representatives signed the Final Act are: Algeria, Argentina, Australia, Belgium, Benin, Brazil, Cameroon, Canada, China, Colombia, Côte d'Ivoire, Croatia, Cuba, Denmark, Ecuador, Egypt, El Salvador, Estonia, Finland, France, Gabon, Gambia, Germany, Ghana, Greece, Guinea, Haiti, Honduras, Indonesia, Iran (Islamic Republic of), Italy, Japan, Latvia, Liberia, Lithuania, Madagascar, Malta, Marshall Islands, Mexico, Monaco, Mozambique, Netherlands, Nigeria, Norway, Pakistan, Panama, Peru, Philippines, Portugal, Republic of Korea, Romania, Russian Federation, Singapore, Slovenia, Spain, Sri Lanka, Sudan, Syrian Arab Republic, Sweden, Switzerland, Thailand, Tunisia, Turkey, Ukraine, United Kingdom of Great Britain and Northern Ireland, United Republic of Tanzania, United States of America, and Viet Nam.

- 8 -

## INTERNATIONAL CONVENTION ON ARREST OF SHIPS, 1999

*The States Parties to this Convention,*

*Recognizing* the desirability of facilitating the harmonious and orderly development of world seaborne trade,

*Convinced* of the necessity for a legal instrument establishing international uniformity in the field of arrest of ships which takes account of recent developments in related fields,

*Have agreed* as follows:

### Article 1
### Definitions

For the purposes of this Convention:

1.    "Maritime Claim" means a claim arising out of one or more of the following:

   (a)    loss or damage caused by the operation of the ship;

   (b)    loss of life or personal injury occurring, whether on land or on water, in direct connection with the operation of the ship;

   (c)    salvage operations or any salvage agreement, including, if applicable, special compensation relating to salvage operations in respect of a ship which by itself or its cargo threatened damage to the environment;

   (d)    damage or threat of damage caused by the ship to the environment, coastline or related interests; measures taken to prevent, minimize, or remove such damage; compensation for such damage; costs of reasonable measures of reinstatement of the environment actually undertaken or to be undertaken; loss incurred or likely to be incurred by third parties in connection with such damage; and damage, costs, or loss of a similar nature to those identified in this subparagraph (d);

   (e)    costs or expenses relating to the raising, removal, recovery, destruction or the rendering harmless of a ship which is sunk, wrecked, stranded or abandoned, including anything that is or has been on board such ship, and costs or expenses relating to the preservation of an abandoned ship and maintenance of its crew;

   (f)    any agreement relating to the use or hire of the ship, whether contained in a charter party or otherwise;

- 9 -

(g)    any agreement relating to the carriage of goods or passengers on board the ship, whether contained in a charter party or otherwise;

(h)    loss of or damage to or in connection with goods (including luggage) carried on board the ship;

(i)    general average;

(j)    towage;

(k)    pilotage;

(l)    goods, materials, provisions, bunkers, equipment (including containers) supplied or services rendered to the ship for its operation, management, preservation or maintenance;

(m)    construction, reconstruction, repair, converting or equipping of the ship;

(n)    port, canal, dock, harbour and other waterway dues and charges;

(o)    wages and other sums due to the master, officers and other members of the ship's complement in respect of their employment on the ship, including costs of repatriation and social insurance contributions payable on their behalf;

(p)    disbursements incurred on behalf of the ship or its owners;

(q)    insurance premiums (including mutual insurance calls) in respect of the ship, payable by or on behalf of the shipowner or demise charterer;

(r)    any commissions, brokerages or agency fees payable in respect of the ship by or on behalf of the shipowner or demise charterer;

(s)    any dispute as to ownership or possession of the ship;

(t)    any dispute between co-owners of the ship as to the employment or earnings of the ship;

(u)    a mortgage or a "hypothèque" or a charge of the same nature on the ship;

(v)    any dispute arising out of a contract for the sale of the ship.

2.    "Arrest" means any detention or restriction on removal of a ship by order of a Court to secure a maritime claim, but does not include the seizure of a ship in execution or satisfaction of a judgment or other enforceable instrument.

- 10 -

3.    "Person" means any individual or partnership or any public or private body, whether corporate or not, including a State or any of its constituent  subdivisions.

4.    "Claimant" means any person asserting a maritime claim.

5.    "Court" means any competent judicial authority of a State.

### Article 2
### Powers of arrest

1.    A ship may be arrested or released from arrest only under the authority of a Court of the State Party in which the arrest is effected.

2.    A ship may only be arrested in respect of a maritime claim but in respect of no other claim.

3.    A ship may be arrested for the purpose of obtaining security notwithstanding that, by virtue of a jurisdiction clause or arbitration clause in any relevant contract, or otherwise, the maritime claim in respect of which the arrest is effected is to be adjudicated in a State other than the State where the arrest is effected, or is to be arbitrated, or is to be adjudicated subject to the law of another State.

4.    Subject to the provisions of this Convention, the procedure relating to the arrest of a ship or its release shall be governed by the law of the State in which the arrest was effected or applied for.

### Article 3
### Exercise of right of arrest

1.    Arrest is permissible of any ship in respect of which a maritime claim is asserted if:

   (a)    the person who owned the ship at the time when the maritime claim arose is liable for the claim and is owner of the ship when the arrest is effected; or

   (b)    the demise charterer of the ship at the time when the maritime claim arose is liable for the claim and is demise charterer or owner of the ship when the arrest is effected; or

   (c)    the claim is based upon a mortgage or a "hypothèque" or a charge of the same nature on the ship; or

   (d)    the claim relates to the ownership or possession of the ship; or

- 11 -

(e)     the claim is against the owner, demise charterer, manager or operator of the ship and is secured by a maritime lien which is granted or arises under the law of the State where the arrest is applied for.

2.      Arrest is also permissible of any other ship or ships which, when the arrest is effected, is or are owned by the person who is liable for the maritime claim and who was, when the claim arose:

(a)     owner of the ship in respect of which the maritime claim arose; or

(b)     demise charterer, time charterer or voyage charterer of that ship.

This provision does not apply to claims in respect of ownership or possession of a ship.

3.      Notwithstanding the provisions of paragraphs 1 and 2 of this article, the arrest of a ship which is not owned by the person liable for the claim shall be permissible only if, under the law of the State where the arrest is applied for, a judgment in respect of that claim can be enforced against that ship by judicial or forced sale of that ship.

### *Article 4*
### *Release from arrest*

1.      A ship which has been arrested shall be released when sufficient security has been provided in a satisfactory form, save in cases in which a ship has been arrested in respect of any of the maritime claims enumerated in article 1, paragraphs 1 (s) and (t). In such cases, the Court may permit the person in possession of the ship to continue trading the ship, upon such person providing sufficient security, or may otherwise deal with the operation of the ship during the period of the arrest.

2.      In the absence of agreement between the parties as to the sufficiency and form of the security, the Court shall determine its nature and the amount thereof, not exceeding the value of the arrested ship.

3.      Any request for the ship to be released upon security being provided shall not be construed as an acknowledgement of liability nor as a waiver of any defence or any right to limit liability.

4.      If a ship has been arrested in a non-party State and is not released although security in respect of that ship has been provided in a State Party in respect of the same claim, that security shall be ordered to be released on application to the Court in the State Party.

5.      If in a non-party State the ship is released upon satisfactory security in respect of that ship being provided, any security provided in a State Party in respect of the same claim shall be ordered to be released to the extent that the total amount of security provided in the two States exceeds:

- 12 -

     (a)    the claim for which the ship has been arrested, or

     (b)    the value of the ship,

whichever is the lower.  Such release shall, however, not be ordered unless the security provided in the non-party State will actually be available to the claimant and will be freely transferable.

6.     Where, pursuant to paragraph 1 of this article, security has been provided, the person providing such security may at any time apply to the Court to have that security reduced, modified, or cancelled.

### *Article 5*
### *Right of rearrest and multiple arrest*

1.     Where in any State a ship has already been arrested and released or security in respect of that ship has already been provided to secure a maritime claim, that ship shall not thereafter be rearrested or arrested in respect of the same maritime claim unless:

     (a)    the nature or amount of the security in respect of that ship already provided in respect of the same claim is inadequate, on condition that the aggregate amount of security may not exceed the value of the ship; or

     (b)    the person who has already provided the security is not, or is unlikely to be, able to fulfil some or all of that person's obligations; or

     (c)    the ship arrested or the security previously provided was released either:

          (i)    upon the application or with the consent of the claimant acting on reasonable grounds, or

          (ii)    because the claimant could not by taking reasonable steps prevent the release.

2.     Any other ship which would otherwise be subject to arrest in respect of the same maritime claim shall not be arrested unless:

     (a)    the nature or amount of the security already provided in respect of the same claim is inadequate; or

     (b)    the provisions of paragraph 1 (b) or (c) of this article are applicable.

3.     "Release" for the purpose of this article shall not include any unlawful release or escape from arrest.

- 13 -

### *Article 6*
### *Protection of owners and demise charterers of arrested ships*

1.      The Court may as a condition of the arrest of a ship, or of permitting an arrest already effected to be maintained, impose upon the claimant who seeks to arrest or who has procured the arrest of the ship the obligation to provide security of a kind and for an amount, and upon such terms, as may be determined by that Court for any loss which may be incurred by the defendant as a result of the arrest, and for which the claimant may be found liable, including but not restricted to such loss or damage as may be incurred by that defendant in consequence of:

  (a)    the arrest having been wrongful or unjustified; or

  (b)    excessive security having been demanded and provided.

2.      The Courts of the State in which an arrest has been effected shall have jurisdiction to determine the extent of the liability, if any, of the claimant for loss or damage caused by the arrest of a ship, including but not restricted to such loss or damage as may be caused in consequence of:

  (a)    the arrest having been wrongful or unjustified, or

  (b)    excessive security having been demanded and provided.

3.      The liability, if any, of the claimant in accordance with paragraph 2 of this article shall be determined by application of the law of the State where the arrest was effected.

4.      If a Court in another State or an arbitral tribunal is to determine the merits of the case in accordance with the provisions of article 7, then proceedings relating to the liability of the claimant in accordance with paragraph 2 of this article may be stayed pending that decision.

5.      Where pursuant to paragraph 1 of this article security has been provided, the person providing such security may at any time apply to the Court to have that security reduced, modified or cancelled.

### *Article 7*
### *Jurisdiction on the merits of the case*

1.      The Courts of the State in which an arrest has been effected or security provided to obtain the release of the ship shall have jurisdiction to determine the case upon its merits, unless the parties validly agree or have validly agreed to submit the dispute to a Court of another State which accepts jurisdiction, or to arbitration.

2.      Notwithstanding the provisions of paragraph 1 of this article, the Courts of the State in which an arrest has been effected, or security provided to obtain the release of the ship, may

- 14 -

refuse to exercise that jurisdiction where that refusal is permitted by the law of that State and a Court of another State accepts jurisdiction.

3.      In cases where a Court of the State where an arrest has been effected or security provided to obtain the release of the ship:

(a)      does not have jurisdiction to determine the case upon its merits; or

(b)      has refused to exercise jurisdiction in accordance with the provisions of paragraph 2 of this article,

such Court may, and upon request shall, order a period of time within which the claimant shall bring proceedings before a competent Court or arbitral tribunal.

4.      If proceedings are not brought within the period of time ordered in accordance with paragraph 3 of this article then the ship arrested or the security provided shall, upon request, be ordered to be released.

5.      If proceedings are brought within the period of time ordered in accordance with paragraph 3 of this article, or if proceedings before a competent Court or arbitral tribunal in another State are brought in the absence of such order, any final decision resulting therefrom shall be recognized and given effect with respect to the arrested ship or to the security provided in order to obtain its release, on condition that:

(a)      the defendant has been given reasonable notice of such proceedings and a reasonable opportunity to present the case for the defence; and

(b)      such recognition is not against public policy (*ordre public*).

6.      Nothing contained in the provisions of paragraph 5 of this article shall restrict any further effect given to a foreign judgment or arbitral award under the law of the State where the arrest of the ship was effected or security provided to obtain its release.

### Article 8
### Application

1.      This Convention shall apply to any ship within the jurisdiction of any State Party, whether or not that ship is flying the flag of a State Party.

2.      This Convention shall not apply to any warship, naval auxiliary or other ships owned or operated by a State and used, for the time being, only on government non-commercial service.

3.      This Convention does not affect any rights or powers vested in any Government or its departments, or in any public authority, or in any dock or harbour authority, under any

- 15 -

international convention or under any domestic law or regulation, to detain or otherwise prevent from sailing any ship within their jurisdiction.

4.    This Convention shall not affect the power of any State or Court to make orders affecting the totality of a debtor's assets.

5.    Nothing in this Convention shall affect the application of international conventions providing for limitation of liability, or domestic law giving effect thereto, in the State where an arrest is effected.

6.    Nothing in this Convention shall modify or affect the rules of law in force in the States Parties relating to the arrest of any ship physically within the jurisdiction of the State of its flag procured by a person whose habitual residence or principal place of business is in that State, or by any other person who has acquired a claim from such person by subrogation, assignment or otherwise.

### Article 9
### Non-creation of maritime liens

Nothing in this Convention shall be construed as creating a maritime lien.

### Article 10
### Reservations

1.    Any State may, at the time of signature, ratification, acceptance, approval, or accession, or at any time thereafter, reserve the right to exclude the application of this Convention to any or all of the following :

      (a)    ships which are not seagoing;

      (b)    ships not flying the flag of a State Party;

      (c)    claims under article 1, paragraph 1 (s).

2.    A State may, when it is also a State Party to a specified treaty on navigation on inland waterways, declare when signing, ratifying, accepting, approving or acceding to this Convention, that rules on jurisdiction, recognition and execution of court decisions provided for in such treaties shall prevail over the rules contained in article 7 of this Convention.

### Article 11
### Depositary

This Convention shall be deposited with the Secretary-General of the United Nations.

- 16 -

### Article 12
#### Signature, ratification, acceptance, approval and accession

1.     This Convention shall be open for signature by any State at the Headquarters of the United Nations, New York, from 1 September 1999 to 31 August 2000 and shall thereafter remain open for accession.

2.     States may express their consent to be bound by this Convention by:

     (a)     signature without reservation as to ratification, acceptance or approval; or

     (b)     signature subject to ratification, acceptance or approval, followed by ratification, acceptance or approval; or

     (c)     accession.

3.     Ratification, acceptance, approval or accession shall be effected by the deposit of an instrument to that effect with the depositary.

### Article 13
#### States with more than one system of law

1.     If a State has two or more territorial units in which different systems of law are applicable in relation to matters dealt with in this Convention, it may at the time of signature, ratification, acceptance, approval or accession declare that this Convention shall extend to all its territorial units or only to one or more of them and may modify this declaration by submitting another declaration at any time.

2.     Any such declaration shall be notified to the depositary and shall state expressly the territorial units to which the Convention applies.

3.     In relation to a State Party which has two or more systems of law with regard to arrest of ships applicable in different territorial units, references in this Convention to the Court of a State and the law of a State shall be respectively construed as referring to the Court of the relevant territorial unit within that State and the law of the relevant territorial unit of that State.

### Article 14
#### Entry into force

1.     This Convention shall enter into force six months following the date on which 10 States have expressed their consent to be bound by it.

2.     For a State which expresses its consent to be bound by this Convention after the conditions for entry into force thereof have been met, such consent shall take effect three months after the date of expression of such consent.

- 17 -

### *Article 15*
### *Revision and amendment*

1.    A conference of States Parties for the purpose of revising or amending this Convention shall be convened by the Secretary-General of the United Nations at the request of one-third of the States Parties.

2.    Any consent to be bound by this Convention, expressed after the date of entry into force of an amendment to this Convention, shall be deemed to apply to the Convention, as amended.

### *Article 16*
### *Denunciation*

1.    This Convention may be denounced by any State Party at any time after the date on which this Convention enters into force for that State.

2.    Denunciation shall be effected by deposit of an instrument of denunciation with the depositary.

3.    A denunciation shall take effect one year, or such longer period as may be specified in the instrument of denunciation, after the receipt of the instrument of denunciation by the depositary.

### *Article 17*
### *Languages*

This Convention is established in a single original in the Arabic, Chinese, English, French, Russian and Spanish languages, each text being equally authentic.

DONE AT Geneva this twelfth day of March, one thousand nine hundred and ninety-nine.

IN WITNESS WHEREOF the undersigned being duly authorized by their respective Governments for that purpose have signed this Convention.

- 18 -

## Chapter II

## PREPARATION AND ADOPTION OF A CONVENTION ON ARREST OF SHIPS

(Agenda item 8)

1.    For its consideration of this item, the Conference had before it the following documentation:

"Draft articles for a convention on arrest of ships" (TD/B/IGE.1/5);

"Compilation of comments and proposals by Governments and by intergovernmental and non-governmental organizations on the draft articles for a convention on arrest of ships" (A/CONF.188/3 and Add.1-3);

"Report of the Joint UNCTAD/IMO Intergovernmental Group of Experts on Maritime Liens and Mortgages and Related Subjects on its ninth session" (TD/B/IGE.1/4).

**Opening statements**

2.    The **Deputy Secretary-General of UNCTAD** stressed the importance of the cooperation between UNCTAD and IMO in achieving international uniformity in respect of arrest of ships. The work of the Conference was undoubtedly of paramount importance to the international shipping and trading community, since the establishment of up-to-date rules and regulations governing the arrest of ships would clearly play an important role in facilitating maritime transport and world trade. It was essential that any new instrument should succeed in striking a balance between the interests of owners of cargo and owners of ships in securing the free movement of ships and the right of claimants to obtain security for their claims. This might not be an easy task bearing in mind the differences in approach adopted by common law, which allowed arrest of a ship only in respect of certain maritime claims raised against it, and civil law systems, permitting the claimant to arrest any ship for claims against the owner regardless of the nature of such claims. This goal could only be achieved if a spirit of cooperation and compromise prevailed among delegations. He was confident that the Conference would be able to adopt the final text of a Convention on arrest on ships.

3.    The **Director, Legal and External Relations Division, International Maritime Organization (IMO)**, speaking on behalf of the Secretary-General of IMO, referred to the importance of adopting a new Arrest Convention aimed at providing certainty of law and justice for the benefit of administrations, shipowners, owners of cargo and all those involved in the process of maritime claims. Differences between civil and common law should be overcome in order to ensure, through global international rules, the effectiveness of free trade through

- 19 -

shipping. The mandate contained in the General Assembly resolution 52/182 was a clear expression of the will to do just that.

4.      The **President of the Conference** stressed the importance of the subject of arrest of ships to the international shipping and trading community. The draft Convention was the result of the hard work and cooperation of the delegations and observers who had taken part in the three sessions of the Joint UNCTAD/IMO Intergovernmental Group of Experts on Maritime Liens and Mortgages and Related Subjects, which had prepared the draft. The preparation of any international legal instrument necessarily required compromise on the part of delegations representing different legal systems. This was particularly true in relation to subjects such as arrest of ships, which received divergent legal treatment in different jurisdictions following the civil law and common law systems.

**Consideration of a draft convention**

5.      Consideration of a draft convention proceeded in informal meetings of the Main Committee and the Drafting Committee.

**Proceedings of the closing plenary**

6.      The **Chairman of the Main Committee**, reporting on the substantive work carried out by the Main Committee on the draft convention on arrest of ships, highlighted some of the decisions taken by the Committee concerning issues which had been the subject of considerable debate within the Committee. One of the major points on which opinions had been divided was article 1 on the definition of a "maritime claim"; the main issue had related to whether the Convention should adopt an approach similar to that of the 1952 Convention and provide for a closed list of claims giving rise to a right of arrest or whether it should adopt a flexible approach providing for an open-ended list of claims and avoiding the exclusion of genuine maritime claims from giving rise to right of arrest. After an extensive discussion and an examination of various proposals, the Committee had succeeded in reaching a delicate compromise solution which involved keeping a closed list of claims giving rise to right of arrest, while allowing some flexibility in certain categories of maritime claims. For example, in subparagraph 1 (d) of the draft convention, covering environmental claims, a reference had been included to damage, costs, or loss of a similar nature to those identified in the subparagraph, and in subparagraph (u) the requirement for registration of a "mortgage" or "hypothèque" or a charge of the same nature had been deleted.

7.      Another important issue which had given rise to a lengthy debate was article 3, dealing with the exercise of the right of arrest. With regard to paragraph 1 concerning arrest of a ship in respect of which a maritime claim was asserted, the Committee had agreed to rearrange the order of the subparagraphs by first stating the general rule requiring the liability of the owner for the purpose of arrest and then cases where the demise charterer was liable for claim, followed by exceptions where liability of the owner was not required for the purpose of arrest. The arrest of a ship irrespective of the liability of the owner was permitted if the claim was based on a mortgage or hypothèque or concerned ownership or possession of the ship, or if the claim was

- 20 -

against the demise charterer, manager or operator of the ship and was secured by a maritime lien which was granted or arose under the law of the State where the arrest was applied for. In that way, all maritime liens granted or arising under the law of the forum arresti would be covered. Hence, if the State concerned was also a Party to the 1993 International Convention on Maritime Liens and Mortgages, both liens afforded under articles 4 and 6 of that Convention would be covered.

8.    Paragraph 2 of article 3 dealing with so-called sister ship arrest had also been debated at length. It had been pointed out by some delegations that the proliferation of single-ship companies since 1952 had often in effect excluded the possibility of sister ship arrest and had meant that the only option available to many claimants was to arrest the particular ship in respect of which a maritime claim arose. It had therefore been proposed to adopt provisions specifically providing for the arrest of "associated" ships using the concept of control as the criterion for establishing an association. A further proposal to the same effect had been put forward using the concept of "beneficial ownership". Most delegations considered that although the problem did exist, it was more of a general nature, with implications for other areas of law such as corporate law and contract law, and it could not be solved in the context of the Convention. Other delegations felt that the issue was of particular importance in relation to shipping and should not be left to national law. Although the proposal had been further considered and developed in an informal group, it had not received wide support in the Committee. The Committee had therefore decided to maintain the existing text of article 3, paragraph 2, of the draft convention, subject to drafting amendments.

9.    Article 7 dealing with jurisdiction on the merits of the case had been amended so that, as a general rule, jurisdiction to determine a case upon its merits would be granted only to the Courts of the State in which an arrest was  effected or security provided to obtain the release of the ship. The reference to jurisdiction of States in which security was given to prevent arrest had been deleted. Article 7, paragraph 5, dealing with the recognition and enforcement of foreign judgments, had been debated extensively. Proposals had been made to leave the matter to the relevant laws in the country where the ship was arrested. It had further been pointed out that reference to "due process of law" was ambiguous and needed clarification. The Committee had agreed to amend the paragraph by stating that such final decisions would be recognized and given effect provided that the defendant had been given reasonable notice of such proceedings and reasonable opportunity to present his case and that such recognition was not against public policy (*ordre public*).

10.    In article 8, dealing with scope of application, the reference to seagoing ships had been deleted. As a result, the Convention would apply to all ships whether or not flying the flag of a State Party. This would promote wider application of the Convention. On the other hand, article 10 permitted States, when becoming Parties to the Convention, to reserve the right to exclude its application to ships which were not seagoing or which did not fly the flag of a State Party.

- 21 -

*Adoption of the Convention by the Conference*

11.     At its third plenary meeting, on 12 March 1999, the **UN/IMO Diplomatic Conference** adopted the International Convention on Arrest of Ships 1999 (A/CONF.188/L.2). (For the text of the Convention, see chapter I above.)

*Statements made subsequent to the adoption of the Convention*

12.     The representative of the **United Kingdom**, referring to the proposal of his delegation on the arrest of ships under the control of effectively one owner, said that his delegation was disappointed that the Conference had been unable to address this issue in the Convention. However, the United Kingdom was heartened to learn that the Conference was not indifferent to the issue and that a number of delegations had acknowledged that there was indeed a significant problem that needed to be addressed. He expressed the hope that other Governments with an interest in furthering the best interests of the maritime community and of claimants in coastal States would continue to discuss appropriate means of dealing with those who would seek to use the corporate veil to avoid their obligations under international agreements.

13.     The representative of the **Marshall Islands** said that, during the first session of the Joint Intergovernmental Group of Experts on Maritime Liens and Mortgages and Related Subjects, the point had been made that the draft text of what was now the 1999 Convention on Arrest of Ships did not fully take into account the powers granted to the holder of a mortgage, under the laws of many nations, to obtain the interlocutory sale of a ship. These powers were available under national law and by virtue of the provisions of the mortgage. In the view of his delegation, a ship mortgage as described in the 1993 Convention on Maritime Liens and Mortgages did not require the detention of a ship in order to obtain security. The mortgage itself provided security, at least under the law of many States. In his view, the present Convention did not preclude the commencement of proceedings to directly enforce those mortgage rights, and he would have preferred this to have been so stated in the Convention. Such legal rights and powers derived from the mortgage, and might not come within the definition of a maritime claim under Article 1 of the Convention.

14.     He called upon intergovernmental organizations, including IMO, UNCTAD, UNIDROIT and UNCITRAL, to continue work on the development and harmonization of laws relating to recognition of security interests in movable property and their enforcement internationally. His delegation would have preferred it if the Convention had given recognition to arrest as a concept in the broader context because it believed that the Convention should include the methods of enforcement which were contemplated in articles 11 and 12, among others, of the 1993 Convention on Maritime Liens and Mortgages and under which a mortgage foreclosure action could be initiated without any need for the restrictive and often lengthy process of a "saisie conservatoire". His delegation would continue to work for recognition of the rights of secured parties under mortgages and other enforceable instruments, and it strongly supported the continued work of international bodies in this direction.

- 22 -

15.    The representative of **Malta** expressed the satisfaction of his delegation with the work accomplished by the Conference and called upon IMO and UNCTAD to do everything in their power to ensure the early implementation of the Convention, which constituted a milestone in the history of international shipping. Follow-up activities should include the provision of technical assistance to ensure the implementation of the Convention in national legislation.

16.    The representative of **Denmark** said that the objective of the Convention was to facilitate international seaborne trade. To reach agreement on the text, difficult compromises had been necessary to take account of the interests of all parties involved. As provided under the Convention, arrest for damage could take place in many situations, including instances of environmental damage and claims of a similar nature. She highlighted the spirit of cooperation which had prevailed among participants at the Conference.

17.    The representative of the **International Ship Suppliers Association** expressed dissatisfaction with article 3 of the Convention, which limited the protection of its members as compared with the existing regime under the 1952 Convention on Arrest of Seagoing Ships. Under the provisions of the new Convention, ship owners and managers might find suppliers unwilling to supply vessels on open credit terms if any doubt existed as to payment being properly protected by international law. This could interfere significantly with the smooth operating of a vessel.

*Adoption of the Final Act*

18.    At its third plenary meeting, on 12 March 1999, the **UN/IMO Diplomatic Conference** adopted the Final Act of the Conference (A/CONF.188/L.3). The Final Act was then signed by the representatives of 68 States. (For the text of the Final Act, including a list of the 68 signatories, see chapter I above.)

*Closing statements*

19.    The **Secretary-General of UNCTAD** highlighted the importance of the new Convention in terms of contributing to the harmonization of international maritime legislation. The Convention, by taking account of recent developments, represented an improvement over the 1952 Convention. He expressed his satisfaction with the work achieved by the Conference on an issue which had traditionally been the subject of divergent approaches in various legal systems. Having underlined some of the changes introduced by the Convention, he expressed the hope that the new international legal instrument would receive wide international acceptance and achieve its objectives of facilitating international trade and transport and promoting global development. He noted, however, that adopting a new international instrument by itself was not sufficient to achieve this. It was the ratification and implementation of its provisions which were essential for its success. He therefore invited States which had participated in the Conference to consider early ratification of the new treaty. Finally, he emphasized that the preparation and successful conclusion of the new legal instrument by UNCTAD and IMO was another example of the way in which UNCTAD could work in harmony with other international agencies for the furtherance of common objectives.

- 23 -

20.     The **Director, Legal and External Relations Division, International Maritime Organization** (IMO), speaking on behalf of the Secretary-General of IMO, said that, despite the wide degree of acceptance enjoyed by the 1952 Convention on Arrest of Seagoing Ships, nearly half a century had passed since the treaty had been adopted, and during that time decisive changes had occurred in the field of international navigation. These changes had given rise to the need for the new treaty which, within a framework of legal certainty, reflected a modern approach to language and took account of new features of maritime claims. She noted that the 1999 International Convention on Arrest of Ships, while clearly a compromise text, was nevertheless sufficiently flexible to accommodate the main requirements and interests of all those involved in global sea trade. This, she underlined, was reason enough to consider its early ratification and consequent entry into force.

21.     The **President of the Conference** said that the adoption of the new Convention constituted an important expression of political will to update international rules of law. The text adopted provided a good compromise between different legal systems and did not depart from the main thrust of the 1952 Convention as regards protecting the interests of both shipowners and claimants. The new Convention clarified a number of legal concepts and succeeded not only in aligning its provisions with the 1993 International Convention on Maritime Liens and Mortgages but also in taking account of recent developments in the field of maritime law. He applauded the excellent cooperation between UNCTAD and IMO as a good example of the vitality and capacity of the United Nations system.

- 24 -

## Chapter III

## ORGANIZATIONAL MATTERS

### A.  Opening of the Conference

(Agenda item 1)

22.    The Conference was opened on Monday, 1 March 1999, by the Deputy Secretary-General of UNCTAD.

### B.  Election of the President

(Agenda item 2)

23.    At its opening plenary, the Conference elected Mr. Zhu Zenjie (China) as its President.

### C.  Adoption of the rules of procedure

(Agenda item 3)

24.    At the same meeting, the Conference adopted its rules of procedure as contained in document A/CONF.188/2.

### D.  Adoption of the agenda and organization of work
### of the Conference

(Agenda items 4 and 5)

25.    At the same meeting, the Conference adopted the provisional agenda contained in document A/CONF.188/1.  The agenda was thus as follows:

1.    Opening of the Conference

2.    Election of the President

3.    Adoption of the rules of procedure

4.    Adoption of the agenda

- 25 -

5.      Organization of the work of the Conference

6.      Election of other officers

7.      Credentials:

   (a)      Appointment of a Credentials Committee

   (b)      Report of the Credentials Committee

8.      Preparation and adoption of a convention on arrest of ships

9.      Consideration and adoption of final resolutions

10.     Other business

11.     Adoption of the report of the Conference

26.     It further approved the organization of work proposed in document A/CONF.188/1. In so doing, it established a Main Committee to deal with the entire set of draft articles, including the final clauses. It also established a Drafting Committee entrusted with the task of redrafting articles or groups of articles on the basis of directions given by the Main Committee and reporting back to that Committee. The Drafting Committee was also entrusted with the task of drafting the Final Act and a preamble for the convention and was requested to submit the texts so drafted to the Plenary of the Conference.

27.     The following countries served as core members of the Drafting Committee: Algeria, Argentina, Belgium, China, Côte d'Ivoire, Croatia, Denmark, Egypt, France, Gambia, Germany, Ghana, Lithuania, Mexico, Russian Federation, Spain, Sri Lanka, Tunisia, Turkey, United Kingdom, and United States of America. The Drafting Committee would at the same time be open-ended.

### E.  Election of other officers

(Agenda item 6)

28.     At the same meeting, the Conference elected its other officers as follows:

| | | |
|---|---|---|
| Chairman of the Main Committee: | Mr. K.J. Gombrii | (Norway) |
| Vice-Presidents: | Mrs. Ida Barinova | (Russian Federation) |
| | Mr. Marc Gauthier | (Canada) |
| | Mr. Eladio Peñaloza | (Panama) |

- 26 -

|                    | Mr. Luigi Rovelli                           | (Italy)     |
|--------------------|---------------------------------------------|-------------|
|                    | Mr. Lalchand K. Sheri                       | (Singapore) |
|                    | Mr. Mahmoud Bahey Eldin Ibrahim Nasrah      | (Egypt)     |
| Rapporteur-General: | Mr. Walter de Sa'Leitao                    | (Brazil)    |

29.    At its 1st meeting, the Drafting Committee elected Mr. Malcolm J. Williams, Jr. (United States of America) as its Chairman.

## F.  Credentials

(Agenda item 7)

### (a)    Appointment of a Credentials Committee

30.    The Conference appointed a Credentials Committee consisting of the following members: Australia; Benin; Brazil; China; Haiti; Mozambique; Philippines; Russian Federation; United States of America.

### (b)    Report of the Credentials Committee

31.    At its 3rd plenary meeting, on 12 March 1999, the Conference adopted the report of the Credentials Committee (A/CONF.188/4).

## G.  Adoption of the report of the Conference

(Agenda item 11)

32.    At its 3rd plenary meeting, on 12 March 1999, the Conference adopted its draft report (A/CONF.188/L.1) and authorized the Rapporteur to complete the report to reflect the proceedings of the final plenary.

- 27 -

## Annex

## ATTENDANCE *

1.    The following States members of UNCTAD, were represented at the Conference:

| | |
|---|---|
| Algeria | Haiti |
| Angola | Honduras |
| Argentina | Hungary |
| Australia | India |
| Belarus | Indonesia |
| Belgium | Iran (Islamic Republic of) |
| Benin | Iraq |
| Brazil | Israel |
| Bulgaria | Italy |
| Burundi | Japan |
| Cameroon | Kenya |
| Canada | Latvia |
| Chile | Lebanon |
| China | Liberia |
| Colombia | Lithuania |
| Côte d'Ivoire | Madagascar |
| Croatia | Malta |
| Cuba | Marshall Islands |
| Cyprus | Mauritania |
| Denmark | Mexico |
| Dominican Republic | Monaco |
| Ecuador | Morocco |
| Egypt | Mozambique |
| El Salvador | Netherlands |
| Estonia | Nigeria |
| Ethiopia | Norway |
| Finland | Pakistan |
| France | Panama |
| Gabon | Peru |
| Gambia | Philippines |
| Georgia | Poland |
| Germany | Portugal |
| Ghana | Republic of Korea |
| Greece | Romania |
| Guinea | Russian Federation |

---

* For the list of participants, see A/CONF.188/INF.1.

- 28 -

| | |
|---|---|
| Senegal | Trinidad and Tobago |
| Singapore | Tunisia |
| Slovakia | Turkey |
| Slovenia | Ukraine |
| South Africa | United Arab Emirates |
| Spain | United Kingdom of Great |
| Sri Lanka | Britain and Northern Ireland |
| Sudan | United Republic of Tanzania |
| Sweden | United States of America |
| Switzerland | Uruguay |
| Syrian Arab Republic | Viet Nam |
| Thailand | Yemen |

2.     The following associate members of IMO attended the Conference as observers:

Hong Kong, China
Macau

3.     The following intergovernmental organizations were represented at the conference:

Arab Labour Organization
Intergovernmental Organization for International Carriage by Rail
Organization of African Unity
Organization of American States
Organization of the Islamic Conference

4.     The Office of Legal Affairs and the United Nations High Commissioner for Refugees were represented at the Conference.

5.     The following non-governmental organizations were represented at the Conference:

*General Category*

International Chamber of Commerce
International Confederation of Free Trade Unions
World Federation of United Nations Associations

*Special Category*

International Ship Suppliers Association
Latin American Association of Navigational Law and Law of the Sea
Ibero-American Institute of Maritime Law
Institute of International Container Lessors
International Association of Ports and Harbours
International Chamber of Shipping
International Group of P and I Clubs
International Maritime Committee
International Union for Conservation of Nature and Natural Resources