# EXHIBIT A



Print this page || Email this page

MANU/SC/0685/1993

**Equivalent Citation:** AIR1993SC1014,    JT1992(2)SC65,    1992(1)SCALE490, 1993Supp(2)SCC433, [1992]1SCR1003

### IN THE SUPREME COURT OF INDIA

Civil Appeal No. 896 of 1992 and Transfer Case No. 27 of 1987 (Arising out of SLP(C) No. 10542 of 1985

Decided On: 26.02.1992

Appellants: **M.V. Elisabeth and Ors.**
Vs.
Respondent: **Harwan Investment and Trading Pvt. Ltd., Hanoekar House, Swatontapeth, Vasco-De-Gama, Goa**

With

Appellants: **M.V. Elisabeth and Anr.**
Vs.
Respondent: **Harwan Investment and Trading Co. and Anr.**

**Hon'ble**                                                                                                  **Judges:**
Dr. Dr. T.K. Thommen and R.M. Sahai, JJ.

**Counsels:**
For Appellant/Petitioner/Plaintiff: Raju Rama Chandran, S.R. Sethia, Aman Vachar, Dhruv Mehta and S.K. Mehta, Advs.

**Subject: Constitution**

**Catch Words**

**Mentioned IN**

**Case**                                                                                                      **Note:**

Constitution – jurisdiction – Colonial Courts of Admiralty (India) Act, 1891 and Constitution of India – appellant foreign ship arrested for acting in breach of duty by leaving port without bill of lading and delivering goods contrary to instructions

of respondent assignor – appellant contended lack of jurisdiction of High Court – Division Bench of High Court upheld admiralty jurisdiction of High Court to take cognizance of matter – appeal – admiralty jurisdiction despite its peculiarities and origin part of totality of jurisdiction vested in High Court as Superior Court of record – once foreign ship arrested in Indian waters by Order of High Court proceedings must continue despite wherever cause of action had arisen – all foreign ships entering into India presumed to know that they fell in jurisdiction of India during their stay in India – owner of bill of lading not precluded from approaching Admiralty Court when foreign ship guilty of violation appeared in Indian waters – appeal
                                                                                                    dismissed.

## JUDGMENT

**T.K. Thommen, J.**

1. We grant leave in SLP(C) No. 10542 of 1985 which arises from the order of the Division Bench of the Andhra Pradesh High Court affirming the finding of the learned Single Judge that the respondent's suit against the appellants was maintainable and that the High Court was competent to try the same in exercise of its admiralty jurisdiction. The Transferred Case No. 27 of 1987 is the appeal filed by defendants 1 and 2 against the judgment of the learned Single Judge of the Andhra Pradesh High Court decreeing the suit. The case stood transferred to this Court pursuant to this Court's Order dated 25.11.1986.

2. By our Order dated August 28, 1991 we allowed Civil Appeal No. 3392 of 1991 filed by the 3rd defendant against the order of the High Court dismissing its petition for condonation of delay in presenting O.S.A.S.R. No. 39789 of 1988 in the High Court. We held that the appeal filed by the 3rd defendant had to be heard on the merits particularly on the question of law regarding the liability of the agent.

3. We shall now deal with the appeal arising from SLP(C) No. 10542 of 1985 where the only question is whether the learned Judges of the High Court have rightly held that the respondent's suit was maintainable in respect of the cause of action alleged to have arisen on or after 1.2.1984 when the vessel, M.V. Elisabeth, was lying in the Port of Marmagao; on 8.2.1984 when the vessel left the Port without issuing bills of lading or other documents for the goods shipped as required by the plaintiff-snipper; and, subsequently when the goods were discharged and handed over to the consignee at the port of destination at Ras-Al-Khaimah, United Arab Emirates during the period from 13.2.84 to 19.2.84, notwithstanding the direction of the plaintiff not to deliver the goods by reason of the buyer's failure to pay the agreed price. The 1st defendant, M.V. Elisabeth, is a vessel of foreign nationality and it is owned by the 2nd defendant which is a foreign company carrying on business in Greece, and the 3rd defendant is stated to be the local agent of the 2nd defendant at Goa.

4. The plaintiff is a private limited company having its registered office in Goa. The case of the plaintiff is that the defendants acted in "breach of duty" by leaving the port of Marmagao on 8.2.84 and delivering the goods to the consignee in breach of the plaintiff's directions to the contrary, thereby committing conversion of the goods entrusted with them. The suit was instituted in Andhra Pradesh High Court invoking its admiralty jurisdiction by means of an action in rent. The vessel was arrested when it entered the Port of Vishakhapatnam on 13.4.84 after returning from foreign ports. On the owner of the vessel entering appearance and providing security by furnishing a Bank Guarantee under protest in the sum of Rs. 14,25,000/-, the vessel was released from detention.

5. The defendants moved an application in the High Court raising a preliminary objection to the jurisdiction of that Court. They contended that the plaintiff's suit against a foreign ship owned by a foreign company not having a place of residence or business in India was not liable to be proceeded against on the admiralty side of the High Court by an action in rem in respect of a cause of action alleged to have arisen by reason of a tort or a breach of obligation arising from the carriage of goods from apart in India to a foreign port. They did not, however, contend that the alleged cause of action not having arisen in Andhra Pradesh, the suit ought not to have been filed in Andhra Pradesh. Their sole contention on the question of jurisdiction was as regards the lack of admiralty jurisdiction of any court in Andhra Pradesh or any other State in India to proceed in rem against the ship on the alleged cause of action concerning carriage of goods from an Indian port to a foreign port. The preliminary objection was overruled by the learned Single Judge and his order was confirmed by the learned Judges of the Division Bench by their order which is challenged in S.L.P (C) No. 10542 of 1985. The suit was finally decreed by the learned Single Judge and appeal therefrom is the suject-matter of the case transferred to this Court.

6. The crucial question for our consideration is, therefore, the dispute about jurisdiction. If that question were to be answered in favour of the defendants, it would be unnecessary to express any view on the merits of the Transferred Case, for the suit itself would then stand dismissed.

7. Mr. Raju Ramachandran, appearing for the appellants (defendants), raises a fundamental objection as to the assumption of admiralty jurisdiction over a foreign ship in respect of a claim arising in connection with the carriage of goods from an Indian port to a port outside India. The High Court, he says, ordered the arrest of the vessel in purported exercise of its jurisdiction on the admiralty side. The power of the High Court on the admiralty side is, however, contained in and confined to the provisions of the Admiralty Court Act, 1861 (24 & 25 Victoriae, Ch. 10) made applicable to India by the Colonial Courts of Admiralty Act, 1890 (53 & 54 Victoriae) (which are Acts of the British Parliament) read with the Colonial Courts of Admiralty (India) Act, 189/1 (Act No. 16 of 1891) declaring certain Indian Courts of unlimited civil jurisdiction as colonial courts of admiralty and declaring the High Court of Judicature at Madras as one of such courts. Mr. Ramachandran does not dispute that by reason of the Andhra State Act, 1953, and the States Re-organisation Act, 1956 read with the Government of India Acts, 1915 and 1935 and the Constitution of India, the High Court of Andhra Pradesh has, like the

High Courts of Madras, Bombay and Calcutta, such admiralty jurisdiction as was granted by the British Statutes referred to above. But that jurisdiction, counsel says, was not wider than what was granted under the British Statutes. The extent of admiralty jurisdiction and the judicial power peculiar to that jurisdiction, as conferred on the Indian High Courts, remained frozen as on the date of the Admiralty Court Act, 1861. The wider powers assumed by the British Courts under the subsequent statutes of that country did not enlarge the admiralty jurisdiction of the Indian High Courts. In the absence of any subsequent British or Indian statute widening the admiralty jurisdiction of the Indian High Courts, the jurisdiction of the Andhra Pradesh High Court over a foreign ship by means of an action in rem does not extend to any matter falling outside the Admiralty Court Act, 1861. The only provision of that Act respecting cargo is what is contained in Section 6 which is confined to goods 'carried into any Port in England or Wales in any Ship...'. Applying that provision to India by reason of the statutes referred to above, the Indian High Court exercising admiralty jurisdiction has no power to deal with any claim concerning outward cargo because Section 6 is confined to inward cargo. The plaintiffs case is founded on certain facts which clearly fall outside the ambit of Section 6 of the Admiralty Court Act, 1861. Consequently, the arrest of the vessel in purported exercise of admiralty jurisdiction in rem, concerning a claim relating to outward cargo, was null and void and of no effect. This argument, supported as it is by considerable scholarly research on the part of counsel, amounts to an invocation to admit incompetence and disability on the part of the Indian Judicial System to render justice for want of legislative grant of power. Counsel is fortified in his submission by certain decisions of Calcutta, Bombay and other High Courts.

8. Mr. G.L. Sanghi, appearing for the respondent-plaintiff, on the other hand, submits that the impugned judgment of the High Court is sound and correct and requires no interference by this Court because what the High Court has stated is based on a realistic appreciation of the need for liberal construction of the statutes so as to support assumption of jurisdiction to render justice where justice is required to be done rather than resorting to a technical or narrow or pedantic construction resulting in a state of helplessness. Counsel says that every person has a right to approach the Court of the land for appropriate remedy in respect of claims against a foreign ship and its owner, and to deny him that right and to compel him to pursue remedy in a foreign country according to an unfamiliar system of law and practice in strange and uncertain conditions, and consequently incurring high expenses with all the uncertainties of such a pursuit, is unjust and uncalled for. All major systems of law the world over recognise the competence of the coastal State to assume jurisdiction over a foreign ship entering its waters in respect of certain well recognised claims, irrespective of where the cause of action arose or where the defendant has his place of residence or business. The reason for this wide exercise of jurisdiction is that the foreign owner being not available within jurisdiction, and the stay of the foreign ship in the waters of the coastal State being necessarily brief, jurisdiction over the ship has to be exercised by its arrest and detention by means of an action in rem. Counsel submits that the High Court being a Court of record with unlimited jurisdiction, it was never intended by the British Parliament that the admiralty power conferred on certain High Courts should remain frozen as on the date of the passing of the Admiralty Court Act, 1861 and the subsequent changes in the law of Great

Britain should not widen the jurisdiction of the Indian High Courts. In any case, counsel submits, the colonial statutes should not be so construed . as to stand in the way of the Indian High Courts exercising unlimited jurisdiction except where the jurisdiction is barred expressly or by necessary implication. In the absence of any such bar, the powers of the High Court are unlimited and there is no merit in the preliminary objection to the jurisdiction of the High Court.

9. The Andhra Pradesh High Court is the successor to the Madras High Court in respect of the territories transferred from Madras and included in the State of Andhra which was formed by the Andhra State Act, 1953 (Act 30 of 1953). Vishakhapatnam is one of the areas so included in the State of Andhra. Section 30 of this Act provides:

> 30. Jurisdiction of Andhra High Court - The High Court of Andhra shall have, in respect of the territories for the time being included in the State of Andhra, all such original, appellate and other jurisdiction as, under the law in force immediately before the prescribed day, is exercisable in respect of the said territories or any part thereof by the High Court at Madras.

10. The High Court of Andhra was redesignated as the High Court of Andhra Pradesh when the State was so named by the States Re-organisation Act, 1956. Section 52 of that Act < provides:

> 52. Jurisdiction of High Courts for new States. - The High Court for a new State shall have, in respect of any part of the territories included in that new State, all such original, appellate and other jurisdiction as, under the law in force immediately before the appointed day, is exercisable in respect of that part of the said territories by any High Court or Judicial < Commissioner's Court for an existing State.

In the port of Vishakhapatanam the Andhra Pradesh High Court has thus the same jurisdiction as was vested in the Madras High Court prior to the transfer of that territory. The question is as regards the extent and nature of that jurisdiction.

11. The powers of the Madras High Court are traceable to the Admirably Court Act, 1861 (24 & 25 Victoriae c. 104) by reason of the Letters Patent of 1865 read with the Colonial Courts of Admiralty Act, 1890 and the Colonial Courts of Admiralty (India) Act, 1891. By the last two Acts, the Madras High Court was invested with the same admiralty jurisdiction as was vested in the High Court of England. The Letters Patent of 1865 declared that the High Court of Madras would and continue to be a court of record and that it would exercise ordinary, original and civil jurisdiction within its local limits to try and determine suits. The Government of India Act, 1915 declared that all the High Courts established by Letters Patent were courts of record and had such original and appellate jurisdiction including admiralty jurisdiction as had been vested in them by Letters Patent. The Government of India Act, 1935 declared mat 'every High Court shall be a court of record' and that its jurisdiction, the law administered by it and the powers of the judges were the same as immediately before the commencement of Part III of that Act (sections 220 and 223). Article 225 of the Constitution of India declares:

...the jurisdiction of, and the law administered in, any existing High Court, and the respective powers of the Judges thereof in relation to the administration of justice in the Court, including any power to make rules of Court and to regulate the sittings of the Court and of members thereof sitting alone or in Division Courts, shall be the same as immediately before the commencement of this Constitution:

Provided...

Article 215 says:

Every High Court shall be a court of record and shall have all the powers of such a court including the power to punish for contempt of itself.

12. In a number of decisions of the Calcutta and Bombay High Courts, the admiralty jurisdiction of the High Courts in India has been historically traced to the Charters of 1774 and 1728, as subsequently expanded and clarified by the Letters Patent of 1823, 1862 and 1865 read with the Admiralty Court Act, 1861, the Colonial Courts of Admiralty Act, 1890, and the Colonial Court of Admiralty (India) Act, 1891 and preserved by Section 106 of the Government of India Act, 1915, Section 223 of the Government of India Act, 1935 and Article 225 of the Constitution of India. The pre-Constitution enactments have continued to remain in force in India as existing laws: See Section 18 of the Indian Independence Act, 1947, and Article 372 of the Constitution of India. See Kamalakar Mahadev Bhagat v. Scindia Steam Navigation Co. Ltd. MANU/MH/0046/1961 Mrs. Sahida Ismail v. Petko R. Salvejkov and Ors. MANU/MH/0051/1973 Jayaswal Shipping Company v. 'S.S. Leelavati' MANU/WB/0142/1954 Rungta Sons Pvt. Ltd. and Anr. v. S.S. 'Edison Mariner' and Anr. 1961-62 (66) Calcutta Weekly Notes 1083 and Smt. Reena Padhi v. 'Jagdhir' MANU/OR/0019/1982 The view taken in these decisions is that the admiralty jurisdiction of the High Court in India does not extend beyond the ambit of the provisions of the (English) Admiralty Court Act, 1861. Further expansion of the jurisdiction of the English High Court under various statutes did not expand the jurisdiction of the Indian High Courts. This means, no High Court in India has jurisdiction to order the arrest and detention of a foreign ship in an action in rem in respect of a cause of action relating to outward cargo, as distinguished from inward cargo.

13. The rationale of these decisions is that the chartered High Courts in India are Colonial Courts of Admiralty under Act 16 of 1891 exercising the same jurisdiction as was vested in the High Court of Admiralty in England under the Admiralty Court Act, 1861, and the subsequent merger of the English High Court of Admiralty with the English High Court of Justice in 1875 and the expansion of jurisdiction of that High Court under subsequent statutes did not expand the admiralty power of the Indian High Court or merge it with its ordinary original civil jurisdiction. P.B. Mukharji, J. of the Calcutta High Court in Jayaswal Shipping Company v. 'S.S. Leelavati' MANU/WB/0142/1954 highlights this aspect thus:

...Courts of Admiralty are courts of specific jurisdiction and if a controversy does not come within their specific jurisdiction, they cannot entertain it, and in mat respect are unlike the courts of residuary jurisdiction such as the Common Law Courts or in India the Courts of ordinary original civil jurisdiction.

In National Co. Ltd. v. Asia Mariner 72 CWN 635, 647, S.K. Muknerjea, J. of the Calcutta High Court states:

The High Court at Calcutta as a Court of Admiralty is, therefore, a Court of prescribed jurisdiction. Its jurisdiction is prescribed by clause 26 of the Charter of 1774 and by Section 2(2) of the Colonial Courts of Admiralty Act, 1890. The jurisdiction has not been extended or modified by any statute. None of the subsequent British statutes by which the Admiralty Jurisdiction of the High Court in England has been extended or affected have been made applicable to India.

14. The High Court as a Court of Admiralty is thus treated as a separate entity exercising a distinct and specific or prescribed or limited jurisdiction. This reasoning is based on the assumption that the continuance in force of the Colonial Courts of Admiralty Act, 1890 as an existing law carves out a distinct jurisdiction of the High Court limited in ambit and efficacy to what has been granted by the Admiralty Court Act, 1861, and that jurisdiction has remained stultified ever since. This restrictive construction is, in our view, not warranted by the provisions of the Constitution. The fact that the High Court continues to enjoy the same jurisdiction as it had immediately before the commencement of the Constitution, as stated in Article 225, does not mean that a matter which is covered by the Admiralty Court Act, 1861 cannot be otherwise dealt with by the High Court, subject to its own Rules, in exercise of its manifold jurisdiction, which is, unless barred, unlimited. To the extent not barred expressly or by necessary implication, the judicial sovereignity of this country is manifested in the jurisdiction vested in the High Courts as superior courts.

15. S.K. Mukherjea, J., however, continues (ibid, para 94):

The Admiralty Court Act, 1861, although repealed in part in relation to England and Wales, remains in force in India. None of the subsequent English statutes relating to Admiralty jurisdiction over cargo claims or contract of carriage have been made applicable to the High Courts in India exercising jurisdiction in Admiralty.

16. A similar view is echoed in other decisions on the point. In Kamalakar Mahadev Bhagat v. Scindia Steam Navigation Co. Ltd. MANU/MH/0046/1961 a learned Judge of the Bombay High Court stated:

...It will thus be seen that the' High Court of Judicature at Bombay in particular being one of the Colonial Courts of Admiralty under Act 16 of 1891 today exercises the same admiralty jurisdiction as was exercised by

the High Court of Admiralty in England in 1890 when the Colonial Courts of Admiralty Act was passed by the British Parliament. We have, therefore, to examine and ascertain as to what was the scope and nature of jurisdiction of the High Court of Admiralty in England either under any statute or otherwise in the year 1890, because, it would be just that jurisdiction which is exercisable by the High Court of Judicature at Bombay down to date.

With respect we disagree. All this is reminiscent of a bygone age. The learned Judge failed to take note of the fact that in 1890 the Court of Admiralty had ceased to be a separate and distinct institution. By the Judicature Act of 1873, the High Court of Admiralty was merged with the High Court of Justice. It is, however, true that the substantive powers in admiralty • matters were derived from the Admiralty Court Act, 1861, and those powers were not widened until 1920. The learned Judge further observes:

> ...In my opinion, therefore, the present suit falls within the exclusive Admiralty jurisdiction of the High Court and could not have been filed on the Ordinary Original Side of the High Court, much less in the City Civil Court. In this view of the matter, I am unable to agree with the view expressed by the learned Principal Judge of the City Civil Court that actions in personam used to be entertained in the Common Law Courts in England in respect of damage done by a ship on the high seas and that even at present in England it is open to a suitor to file an action in personam in the King's Bench Division in respect thereof. In my opinion, no such action ever lay in the Common Law Courts of England, nor can it ever lie in the Queen's Bench Division of the High Court of England at the present time....

All this observation, as we shall presently see, is inconsistent with the true character of the constitution of the courts in England and the powers exercised by them consequent upon the statutory changes between 1873 and 1981.

17. It is true that the Colonial statutes continue to remain in force by reason of Article 372 of the Constitution of India, but that does not stultify the growth of law or blinker its vision or fetter its arms. Legislation has always marched behind time, but it is the duty of the Court to expound and fashion the law for the present and the future to meet the ends of justice.

18. We do not accept the reasoning of the High Courts in the decisions cited above on the question of jurisdiction, whatever be the correctness of their decisions on the peculiar facts of those cases in regard to which we express no view. But the narrow view adopted in those decisions on the source and ambit of the admiralty jurisdiction of the High Courts is, in our opinion, not warranted.

19. Mr. Ramachandran has laid much stress on the decision of the Privy Council in The Yuri Maru v. The Woron, 1927 AC 906, which was relied on by the Bombay High Court in Mrs. Sahida Ismail (supra) to come to the conclusion, which it did, as to the lack of jurisdiction of the Indian High Courts to go beyond what was permitted by the Colonial Courts of Admiralty Act, 1890.

20. Before we deal with the decision of the Privy Council, it is important to notice that the Colonial Courts of Admiralty were vested with the same admiralty jurisdiction which was vested in the High Court of England 'whether existing by virtue of any statute or otherwise' and they were entitled to exercise the same jurisdiction in like manner and to the same extent as the High Court in England. We shall now read the provisions of the Colonial Courts of Admiralty Act, 1890, so far as they are material.

> 2. (1). *Colonial Courts of Admiralty* - Every court of law in a British possession, which is for the time being declared in pursuance of this Act to be a court of Admiralty, or which, if no such declaration is in force in the possession, has therein original unlimited civil jurisdiction, shall be a court of Admiralty, with the jurisdiction in this Act mentioned, and may for the purpose of that jurisdiction exercise all the powers which it possesses for the purpose of its other civil jurisdiction, and such court in reference to the jurisdiction conferred by this Act is in this Act referred to as a Colonial Court of Admiralty....

> (2). The jurisdiction of a Colonial Court of Admiralty shall, subject to the provisions of this Act, be over the *like places, persons, matters, and things,* as the Admiralty jurisdiction of the High Court in England, *whether existing by virtue of any statute or to otherwise, and the Colonial Court of Admiralty may exercise such jurisdiction in like manner and to as full an extent as the High Court in England,* and shall have the same regard as that Court to international law and the comity of nations.

> (3)....

> Provided as follows:

>> (a) Any enactment in an Act of the Imperial Parliament referring to the Admiralty jurisdiction of the High Court in England, when applied to a Colonial Court of Admiralty in a British possession, shall be read as if the name of that possession were therein *substituted for England and Wales;* and....

>                                   (emphasis supplied)

These provisions show that the admiralty jurisdiction conferred on the Colonial Courts of Admiralty was identical to that of the High Court in England. The Colonial Courts of Admiralty were, in relation to their respective territories, invested with the same jurisdiction "over places, persons, matters and things" as in the case of the English High Court in respect of England and Wales. This jurisdiction was derived from the statutes which then existed in England -namely, the Admiralty Court Acts of 1840 and 1861, as well as from other sources such as custom and practice as recognised by the Courts exercising admiralty jurisdiction. This is clear from the words "whether existing by virtue

of any statute or otherwise". The proviso makes the position even clearer. What the Colonial Courts of Admiralty Act, 1890 did was not to incorporate any particular English Statute into Indian law for the purpose of conferring admiralty jurisdiction, but to assimilate the competent courts in India to the position of the English High Court in the exercise of admiralty jurisdiction. It would, therefore, appear that any expansion of Admiralty jurisdiction of the High Court in England was intended likewise to expand the jurisdiction of the Colonial Court of Admiralty. This should have been regarded as the position with respect to a Colonial Court of unlimited jurisdiction.

21. Section 3 of this Act provides:

> (3). - The legislature of a British possession may by any Colonial law -
>
>> (a) declare any court of unlimited civil jurisdiction, whether original or appellate, in that possession to be a Colonial Court of Admiralty...".
>>
>> (b) confer upon any inferior or subordinate court in that possession such partial or limited Admiralty jurisdiction under such regulations and with such appeal (if any) as may seen fit:
>>
>> Provided that any such Colonial law shall not confer any jurisdiction which is not by this Act conferred upon a Colonial Court of Admiralty.

Section 3 thus draws a distinction between courts of unlimited jurisdiction falling under Clause (a) and courts of limited jurisdiction falling under Clause (b). The admiralty jurisdiction of the former was wider than that which was conferred on the latter.

22. Section 7 confers power to make rules of court to regulate the procedure and practice of the court in the exercise of its admiralty jurisdiction. This section provides:

> Section 7. - (1) Rules of court for regulating the procedure and practice (including fees and costs) in a court in a British possession in the exercise of the jurisdiction conferred by this Act, whether original or appellate, may be made by the same authority and in the same manner as rules touching the practice, procedure, fees, and costs in the said court in the exercise of its ordinary civil jurisdiction respectively are made.
>
> (2)...
>
> (3) Such rules may provide for the exercise of any jurisdiction conferred by this Act by the full court, or by any judge or judges thereof, and subject to any rules, where the ordinary civil jurisdiction of the court can in any case be exercised by a single judge, any jurisdiction conferred by this Act may in the like case be exercised by a single judge.

23. By virtue of this provision, admiralty rules were made for Calcutta and Bombay High Courts. The Madras High Court adopted admiralty rules by virtue of the powers conferred by the Letters Patent of the High Court and the Government of India Act, 1915.

24. By Act 16 of 1891, certain courts in British India were declared to be Colonial Courts of Admiralty[1]. The High Courts of Judicature at Fort William in Bengal, at Madras and at Bombay were three of the six Courts declared to be Colonial Courts of Admiralty'. The preamble to this Act, in so declaring, stated:

> WHEREAS it is provided by the Colonial Courts of Admiralty Act, 1890, that the Legislature of a British possession may by any colonial law declare any Court of unlimited civil jurisdiction in that possession to be a Colonial Court of Admiralty;....

25. It was because of the unlimited civil jurisdiction that was already vested in these High Courts that they were declared to be Colonial Courts of Admiralty having the same jurisdiction in extent and quality as was vested in the High Court of England by virtue of any statute or custom. The High Courts were declared to be competent to regulate their procedure and practice in exercise of admiralty jurisdiction in accordance with the Rules made in that behalf. There is, therefore, neither reason nor logic in imposing a fetter on the jurisdiction of these High Courts by limiting it to the provisions of an imperial statute of 1861 and freezing any further growth of jurisdiction. This is all the more true because the Admiralty Court Act, 1861 was in substance repealed in England a long time ago. See Halsbury's Laws of England. 4th ed. Vol. 1(1), para 307; Halsbury's Statutes of England, Vol. I, p.9.

26. Assuming that the admiralty powers of the High Courts in India are limited to what had been derived from the Colonial Courts of Admiralty Act, 1890, that Act, having equated certain Indian High Courts to the High Court of England in regard to admiralty jurisdiction, must be considered to have conferred on the former all such powers which the latter enjoyed in 1890 and thereafter during the period preceding the Indian Independence Act, 1947. What the Act of 1890 did was, as stated earlier, not to incorporate any English statute into Indian law, but to equate the admiralty jurisdiction of the Indian High Courts over places, persons, matters and things to that of the English High Court. As the admiralty jurisdiction of the English High Courts expanded with the progress of legislation, and with the repeal of the earlier statutes, including in substance the Admiralty Court Acts of 1840 and 1861, it would have been reasonable and rational to attribute to the Indian High Courts a corresponding growth and expansion of admiralty jurisdiction during the pre-independence era. But a restrictive view was taken on the question in the decisions of the High Courts cited above.

27. There is no reason why the jurisdiction of the Indian High Courts should have been considered to have frozen and atrophied on the date of the Colonial Courts of Admiralty Act, 1890. If this had not been considered to have happened, and a liberal construction had been adopted by courts, the admiralty jurisdiction of the High Court would in any case have been considered to have progressed up to the level of the English Administration of Justice Act, 1928, which was the last of a series of enactments in England on the subject prior to 1947, and consequently the Indian High Court would have been treated as a consolidated court on the basis of the (English) Supreme Court of

Judicature (Consolidation) Act, 1925, exercising identical and unlimited jurisdiction, and not a distinct or 'prescribed' admiralty jurisdiction, limited and confined to the Admiralty Court Act, 1861, as it is now treated to be by some of the High Courts in the decisions cited above. All this is perhaps the result of the reasoning in the decision of the Privy Council in The Yuri Maru v. The Waron 1927 AC 906.

28. The Yuri Maru which arose from Canada concerned the jurisdiction of the Exchequer Court. The decision is summarised in the head note as follows:

> The effect of Section 2, Sub-section 2, of the Colonial Courts of Admiralty Act, 1890(Imp.) is to limit the jurisdiction of Colonial Courts of Admiralty established under the Act to the Admiralty jurisdiction of the High Court of England, as it existed at the passing of the Act; the extension of the Admiralty jurisdiction of the High Court by the Administration of Justice Act, 1920 (Imp.), Section 22, repealed and re-enacted by the Supreme Court of Judicature (Consolidation) Act, 1925 (Imp.), Section 22, does not apply to Colonial Courts of Admiralty. Consequently, the Exchequer Court of Canada, which was established by the Admiralty Act (R.S. Can., 1906, c. 141) as a Colonial Court of Admiralty, has not, under Section 22, sub-section 1(xii), of the above Imperial Act of 1925, jurisdiction in rem to try an action for damages for breach of a charterparty.

29. The Privy Council thus rejected the contention that the jurisdiction of the Canadian Court of Admiralty was automatically extended with the progress of legislation in England widening the admiralty jurisdiction of the English High Court. Nevertheless, the Privy Council significantly left it to the Canadian legislature to pass appropriate laws for widening the jurisdiction of the Canadian Courts. Speaking for the Board, Lord Merrivale concluded:

> On the whole, the true intent of the Act appears to their Lordships to have been to define as a maximum of jurisdictional authority for the Courts to set up thereunder, the Admiralty jurisdiction of the High Court in England as it existed at the time when the Act passed. What shall from time to time be added or excluded is left for independent legislative determination.

30. The Exchequer Court of Canada was established by the Admiralty Act (R.s. Canada, 1906, c. 141) as a Colonial Court of Admiralty. It is not clear whether that Court was in its jurisdiction comparable to the Indian High Courts. Assuming that it was comparable at the relevant time, and whatever be the relevance of The Yuri Maru (supra) to Courts like the Exchequer Court of Canada, we see no reason why the jurisdiction of the Indian High Courts, governed as they now are by the Constitution of India, should in any way be subjected to the jurisdictional fetters imposed by the Privy Council in that decision. Legal history is good guidance for the future, but to surrender to the former is to lose the latter.

31. A short account of the English statutes on admiralty jurisdiction and the power exercised by the English Courts over foreign ships will be helpful in understanding the nature and extent of the admiralty jurisdiction of the Indian Courts. We shall, therefore, briefly discuss the salient features of the admiralty jurisdiction of the English Courts.

32. The customs and practices of the commercial and maritime courts and the Law Merchant administered by them and the jurisdiction assumed by the Admiral over ships and things at sea and the conflict which arose between the Court presided over by him and the common law and equity courts leading to curtailment of the powers of the Admiral and ultimately resulting in consolidation of all the courts by the Supreme Court of Judicature Act, 1873 (which came into force in 1875) are vividly described by eminent Scholars of English legal history and maritime law. See Holdsworth's A History of English Law, Volumes I, 5 and 8; Roscoe's Admiralty Practice, 5th ed., Marsden: Select Pleas of the Court of Admiralty, Volumes I and II; Law and Custom of the Sea, ibid Volumes I and II; Benedict on Admiralty. 6th ed. (1940) Vol. I; Gilmore and Black, Law of Admiralty, 1957.

33. The wide jurisdiction vested in the English Courts is derived from ancient principles of Maritime Law developed by custom and practice as well as from subsequent statutes many of which have incorporated the provisions of International Conventions unifying the laws practised in several maritime countries. It is beyond the scope of this judgment to embark on a survey of maritime history except to notice that both the Admiralty Court and the Common Law Courts claimed jurisdiction over cases governed by maritime law. Although admiralty judges were often compelled to abandon jurisdiction to the Courts of Common Law in various matters, maritime cases involving hypothecation, salvage, torts committed on the high seas arid the like, where the Common Law Courts could not give effective redress, were left to the jurisdiction of the admiralty Judges. The admiralty had, however, 'fallen into a feeble and neglected condition and for long its proceedings excited no attention'. But in the Eighteenth Century, the learning and ability of Lord Stowell 'raised the Court to a position of the highest importance' (Rescoe's Admiralty Practice 5th ed. p. 14).

34. In the words[2] of Holdsworth, "Modern legislation has restored to the court of Admiralty many of the powers, and much of the jurisdiction of which it had been deprived in the seventeenth century... But Admiralty law has lost the international character which it once possessed. It is essentially English Law. The law which is administered in the Admiralty Court of England is the English maritime law. It is not the ordinary municipal law of the country, but it is the law which the English court of Admiralty, either by Act of Parliament or by reiterated decisions and traditions and principles, has adopted as the English maritime[3] law'. 'Neither the laws of the Rhodians, nor of Oleron, nor of Visby, nor of the Hanse towns, are of themselves any part of the Admiralty law of England... But they contain many principles and statements of marine practice, which, together with principles found in the Digest, and in the French, and other Ordinances, were used by the judges of the English court of Admiralty, when they were moulding and reducing to form the principles and practice of their Court[4]."

35. The Admiralty Court Act, 1840 was the first of a series of statutes extending and defining the jurisdiction of the High Court of Admiralty in England. This Act was followed by the Admiralty Court Act, 1861 conferring larger powers upon the High Court of Admiralty. Section 6 of this Act empowered the High Court of Admiralty to assume jurisdiction over foreign ships in respect of claims to cargo carried into any port in England or Wales[5]. Significantly, the Act did not apply to outward cargo. Section 7 of the Act, however, conferred jurisdiction on the High Court of Admiralty "over any claim for damage done by any ship". This Act was followed by the Judicature Act of 1873, which

came into force in 1875 and which merged the High Court of Admiralty with the High Court of Justice resulting in a fusion of admiralty law, common law and equity. It is of interest to note that the provision contained in Section 6 of the Admiralty Court Act, 1861 limiting the jurisdiction of the Admiralty Court to claims respecting inward cargo was discarded by the Administration of Justice Act, 1920 which extended the jurisdiction of the High Court to (a) any claim arising out of an agreement relating to the use or hire of a ship; (b) any claim relating to the carriage of goods in any ship, and (c) any claim in tort in respect of goods carried in any ship. The Act thus applied to both inward and outward cargoes.

36. The Admiralty Court Act, 1861 and the subsequent enactments were consolidated by the Supreme Court of Judicature (Consolidation) Act, 1925. The admiralty jurisdiction of the English High Court was redefined by this Act to include various matters such as any claim "for damage done by a ship"; any claim "arising out of an agreement relating to the use or hire of a ship"; or "relating to the carriage of goods in a ship"; or "in tort in respect of goods carried in a ship". This jurisdiction was, however, not available if "at the time of the institution of the proceedings any owner or part owner of the ship was domiciled in England" [See Section 22(i), (iv) and (viii)]. By the Administration of Justice Act, 1928, the jurisdiction vested in the High Court by the Supreme Court of Judicature (Consolidation) Act, 1925 was declared to belong to all divisions of the High Court. The Admiralty Court was thus empowered to entertain, apart from actions in rem. any claim in personam which could be brought in any other division of the High Court.

37. By the Administration of Justice Act, 1956, the admiralty jurisdiction of the High Court was further widened and redefined so as to include not only the claims specified under Section 1(i) of Part I but also "any other jurisdiction which either was vested in the High Court of Admiralty immediately before the date of the commencement of the Supreme Court of Judicature Act, 1873 (i.e. 1.11.1875), or is conferred by or under an Act which came into operation on or after that date on the High Court as being a court with Admiralty jurisdiction and any other jurisdiction connected with ships or aircraft in the High Court apart from this section which is for the time being assigned by rules of court to the Probate, Divorce and Admiralty Division". Sub-section (4) of this section removed the restriction based on the ownership of the ship. It says that the jurisdiction applied to all ships or aircraft, "whether British or not and whether registered or not and wherever the residence or domicile of their owners may be" and "in relation to all claims, wheresoever arising". The jurisdiction in regard to the questions or claims specified under section 1(i) includes "any claim for damage done by a ship", "any claim for loss of or damage to goods carried in a snip", "any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a snip" [See Clauses (d), (g) & (h)].

38. These claims are now specifically mentioned under Clauses (e), (g)and (h) respectively of Section 20(2) of the Supreme Court Act, 1981, amongst other claims, as falling under the Admiralty jurisdiction of the High Court. Part II of this Act is derived substantially from Part I of the 1956 Act which was enacted to give effect to the Brussels Convention of 1952 relating to the arrest of sea-going ships and the rules concerning civil jurisdiction in matters of collision (Cmd 8954).

39. Section 20 of the Supreme Court Act, 1981 enumerates various questions and claims falling under the admiralty jurisdiction of the English High Court. Apart from matters covered by the Merchant Shipping Acts 1894 to 1979 [referred to in Sub-section (3)] and

certain other matters, various questions and claims are enumerated in Sub-section (2). They include: "any claim for loss of or damage to goods carried in a ship; any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship; any claim for damage received by a ship; and any claim for damage done by a ship".[6]

40. Sub-section (7) of this section specifically provides that the admiralty jurisdiction of the High Court extends to "all ships or aircrafts, whether British or not and wherever the residence or domicile of their owners may be, and to all claims wherever arising". It reads:

> Sub-Section (7). The preceding provisions of this section apply -
>
> (a) in relation to all ships or aircraft, whether British or not and wherever the residence or domicile of their owners may be;
>
> (b) in relation to all claims, wherever arising (including, in the case of cargo or wreck salvage, claims in respect of cargo or wreck found on land); and
>
> (c) so far as they relate to mortgages and charges, to all mortgages or charges, whether registered or not and whether legal or equitable, including mortgages and charges created under foreign law:
>
> Provided that nothing in this sub-section shall be construed as extending the cases in which money or property is recoverable under any of the provisions of the Merchant Shipping Acts 1894 to 1979.

This jurisdiction is wide enough to cover all claims in tort or contract arising out of any agreement for carriage of goods by sea.[7]

41. The whole jurisdiction of the English High Court is now vested in all the divisions alike. All Divisions of the High Court and all the judges of that Court have equal power, authority and jurisdiction, although admiralty actions are assigned to the Queen's Bench Division and taken up by the Admiralty Court.[8] The special requirements of an action in personam, namely, the habitual residence or place of business of the defendant or the cause of action having their nexus with England and Wales or the determination of a connected matter in the English High Court or the submission of the defendant to the jurisdiction of that court, are not applicable to a proceeding commenced as an admiralty action in rem. See Order 75, Rule 4(3) of the Rules of the Supreme Court, 1965[9].

42. The Civil jurisdiction and judgments Act, 1982 enacted into English Law and Scottish Law the EEC Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters.

43. Describing the unified court structure in England, Jackson sums up:

The Admiralty Court developed independently, having its own battle with common law courts over jurisdictional boundaries. During the 18th and early 19th centuries its influence and power decreased, but through statutes of 1840 and 1861 the court received a firm foundation on which it has built since. It came in from the cold into the general union of courts in 1873-5 and is now integrated into the High Court, being a branch of the Queen's Bench Division.

...

Once under the umbrella of the unified court structure, common law and equitable principles became directly available in the Admiralty Court. No longer need claimants have to seek these elsewhere and no longer did jurisdictional boundaries necessarily indicate the availability of substantive rights and remedies. [D.C. Jackson, Enforcement of Maritime Claims. (1985) p. 8]

44. "The law of admiralty, or maritime law,.... (is the) corpus of rules, concepts, and legal practices governing... the business of carrying goods and passengers by water." (Gilmore and Black, The law of Admiralty, page 1). The vital significance and the distinguishing feature of an admiralty action in rem is that this jurisdiction can be assumed by the coastal authorities in respect of any maritime claim by arrest of the ship, irrespective of the nationality of the ship or that of its owners, or the place of business or domicile or residence of its owners or the place where the cause of action arose wholly or in part.

45. ".... In admiralty the vessel has a juridicial personality, an almost corporate capacity, having not only rights but liabilities (sometimes distinct from those of the owner) which may be enforced by process and decree against the vessel, binding upon all interested in her and conclusive upon the world, for admiralty in appropriate cases administers remedies in rem, i.e., against the property, as well as remedies in personam, i.e., against the party personally...." Benedict, The Law of American Admiralty, 6th ed. Vol. I p. 3.

46. Admiralty Law confers upon the claimant a right in rem to proceed against the ship or cargo as distinguished from a right in personam to proceed against the owner. The arrest of the ship is regarded as a mere procedure to obtain security to satisfy judgment. A successful plaintiff in an action in rem has a right to recover damages against the property of the defendant. "The liability of the shipowner is not limited to the value of the res primarily proceeded against... An action .... though originally commenced in rem, becomes a personal action against a defendant upon appearance, and he becomes liable for the full amount of a judgment unless protected by the statutory provisions for the limitation of liability'. (Roscoe's Admiralty Practice, 5th ed. p. 29).

47. The foundation of an action in rem, which is a peculiarity of the Anglo-American law, arises from a maritime lien or claim imposing a personal liability upon the owner of the vessel. A defendant in an admiralty action in personam is liable for the full amount of the plaintiffs established claim. Likewise, a defendant acknowledging service in an action in rem is liable to be saddled with full liability even when the amount of the judgment exceeds the value of the res or of the bail provided. An action in rem lies in the English High Court in respect of matters regulated by the Supreme Court Act, 1981, and in

relation to a number of claims the jurisdiction can be invoked not only against the offending ship in question but also against a 'sistership' i.e., a ship in the same beneficial ownership as the ship in regard to which the claim arose.

> The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner...

> Per Justice Story, The United States v. The Big Malek Adhel, etc. 43 US (2 How.) 210, 233 (1844).

48. Merchant ships of different nationalities travel from port to port carrying goods or passengers. They incur liabilities in the course of their voyage and they subject themselves to the jurisdiction of foreign States when they enter the waters of those States. They are liable to be arrested for the enforcement of maritime claims, or seized in execution or satisfaction of judgements in legal actions arising out of collisions, salvage, loss of life .or personal injury, loss of or damage to goods and the like. They are liable to be detained or confiscated by the authorities of foreign States for violating their customs regulations, safety measures, rules of road, health regulations and for other causes. The coastal State may exercise its criminal jurisdiction on board the vessel for the purpose of arrest or investigation in connection with certain serious crimes. In the course of an international voyage, "a vessel thus subjects itself to the public and private laws of various countries. A ship travelling from port to port stays very briefly in any one port. A plaintiff seeking to enforce his maritime claim against a foreign Ship has no effective remedy once it has sailed away and if the foreign owner has neither property nor residence within jurisdiction. The plaintiff may therefore detain the ship by obtaining an order of attachment whenever it is feared that the ship is likely to slip out of jurisdiction, thus leaving the plaintiff without any security.

49. A ship may be arrested (i) to acquire jurisdiction; or (ii) to obtain security for satisfaction of the claim when decreed; or (iii) in execution of a decree. In the first two cases, the court has the discretion to insist upon security being furnished by the plaintiff to compensate the defendant in the event of it being found that the arrest was wrongful and was sought and obtained maliciously or in bad faith. The claimant is liable in damages for wrongful arrest. This practice of insisting upon security being furnished by the party seeking arrest of the ship is followed in the United States, Japan and other countries. The reason for the rule is that a wrongful arrest can cause irreparable loss and damages to the shipowner, and he should in that event be compensated by the arresting party. (See Arrest of Ships by Hill, Soehring, Hosoi and Helmer, 1985).

50. The attachment by arrest is only provisional and its purpose is merely to detain the ship until the matter has been finally settled by a competent court. The attachment of the vessel brings it under the custody of the marshal or any other authorized officer. Any interference with his custody is treated as a contempt of the court which has ordered the arrest. But the marshal's right under the attachment, order is not one of possession, but only of custody. Although the custody of the vessel has passed from the defendant to the marshal, all the possessory rights which previously existed continue to exist, including all the remedies which are based on possession. The warrant usually contains a monition to

all persons interested to appear before the court on a particular day and show cause why the property should not be condemned and sold to satisfy the claim of the plaintiff.

51. The attachment being only a method of safeguarding the interest of the plaintiff by providing him with a security, it is not likely to be ordered if the defendant or his lawyer agrees to "accept service and to put in bail or to pay money into court in lieu of bail". (See Halsbury's Laws of England, 4th edn, Vol. 1 p. 375 etc.)

52. The service of the warrant is usually effected by affixing it on the main mast or single mast of the snip. A ship which has been arrested under an order of attachment may be released by the court if sufficient bail is put in to cover the claim of the plaintiff as well as the costs of the action. The sureties are liable for the amount entered in the bail bond.

53. If the ship or cargo under arrest before judgment has not been released by the defendant by putting in sufficient bail, and if the property is found deteriorating, the court has the power to order the sale of the property after notice has been duly issued to the parties interested.

54. If the plaintiff has finally obtained a decree of condemnation and sale of the ship, the court will issue an order to the competent Officer commanding him to sell the property, in execution of the decree, and to bring the proceeds into court. Thereupon the officer shall issue proper notice and arrange or the sale of the property by auction. The proceeds of the sale are paid into the registry of the court and they shall be disposed of by the court according to law.

55. A personal action may be brought against the defendant if he is either present in the country or submits to jurisdiction. If the foreign owner of an arrested ship appears before the court and deposits security as bail for the release of his ship against which proceedings in rent have been instituted, he submits himself to jurisdiction,

56. An action in rent is directed against the ship itself to satisfy the claim of the plaintiff out of the res. The ship is for this purpose treated as a person. Such an action may constitute an inducement to the owner to submit to the jurisdiction of the court, thereby making himself liable to be proceeded against by the plaintiff inpersonam. It is, however, imperatie in an action in rent that the ship should be within jurisdiction at the time the proceedings are started. A decree of the court in such an action binds not merely the parties to the writ but everybody in the world who might dispute the plaintiff's claim

57. It is by means of an action in rent that the arrest of a particular ship is secured by the plaintiff. He does not sue the owner directly and by name; but the owner or anyone-interested in the proceedings may appear and defend. The writ is issued to "owners and parties interested in the property proceeded against." The proceedings can be started in England or in the United States in respect of a maritime lien, and in England in respect of a statutory right in rent. A . maritime lien is a privileged claim against the ship or a right to a part of the property in the ship, and it "travels" with the ship. Because the ship has to "pay for the wrong it has done", it can be compelled to do so by a forced sale. (See The Bold Buccleaugh, (1851) 7 Moo. PC 267). In addition to maritime liens, a ship is liable to be arrested in England in enforcement of statutory rights in rent (Supreme Court Act, 1981). If the owner does not submit to the jurisdiction and appear before the court to put in bail and release the ship, it is liable to be condemned and sold to satisfy the claims against her. If, however, the owner submits to jurisdiction and obtains the release of the ship by depositing security, he becomes personally liable to be proceeded against in personam in execution of the judgment if the amount decreed exceeds the amount of the

bail. The arrest of the foreign ship by means of an action in rem is thus a means of assuming jurisdiction by the competent court.

58. The admiralty action in rem, as practised in England or in the United States, is unknown to the civil law. In countries following the civil law, all proceedings are initiated by actions in personam. The President of the Court having competence in the matter has the power to order an attachment of the ship if he is convinced that the plaintiff is likely to lose his security 3 unless the ship is detained within jurisdiction. His hands are not fettered by the technicalities of an action in rem and the scope of the proceedings are not limited to maritime liens or claims.[10] According to the French law, arrest of a ship is allowed even in respect of non-maritime claims and whether or not the claimant is a secured or unsecured creditor. A vessel may be arrested either for the purpose of immobilising the vessel as security (Saisie Conservatoire) or in 3 execution of judgment (Saisie Execution) whether or not the claim has any relation to the vessel. Arrest of the vessel has the advantage of forcing the owner to furnish security to guarantee satisfaction of any decree that may be passed against him. On furnishing sufficient security with the Court, he is usually allowed to secure the release of the vessel. Maritime law is part of the general law of France and other 'civil law countries', and is dealt with by the ordinary courts or tribunals. The presence of any property belonging to the defendant within the territorial jurisdiction confers jurisdiction on the French Court. (See the observation of Lord Diplock in The Jade (1976) 1 All. E.R. 921, 923).

59. The real purpose of arrest in both the English and the Civil Law Systems is to obtain security as a guarantee for satisfaction of the decree, although arrest in England is the basis 4 of assumption of jurisdiction, unless the owner has submitted to jurisdiction. In any event, once the arrest is made and the owner has entered appearance, the proceedings continue in personam. All actions in the civil law - whether maritime or not - are in personam, and arrest of a vessel is permitted even in respect of non-maritime claims, and the vessel is treated as any other property of the owner, and its very presence within jurisdiction is sufficient to clothe the competent tribunal with jurisdiction over the. owner in respect of any claim. [See D.C. Jackson, Enforcement of Maritime Claims, (1985) Appendix 5]. Admiralty actions in England, on the other hand, whether in rem or in personam, are confined to well defined maritime liens or claims and directed against in res (ship, cargo and freight) which is the subject-matter of the dispute or any other ship in the same beneficial ownership as the res in question.

60. Maritime law is as much a part of the general legal system as any other branch of the law. With the merger of the Admiralty and Common Law Courts in England in 1875 and the fusion of their legal precepts and concepts, this branch of the law, despite its peculiarities about actions in rem, is no longer treated as a seperate and independent branch. It is not the exclusive preserve of the English High Court, for certain county courts in that country are specially authorised to exercise this jurisdiction. This is much more true of the civil law system where no distinction is drawn between maritime law and other branches of the law, and they are administered alike by the same courts or tribunals.

61. It may not be correct to say that the admiralty jurisdiction of the Engligh Courts is dependent entirely on statutes. It may be true in a very limited sense as regards the jurisdiction of the High Court after the merger of the High Court of Admiralty with the High Court of justice by the Supreme Court of Judicature Act, 1873 which came into

force in 1875: See Supreme Court of Judicature (Commencement) Act, 1874. Even so, statutes are codifications of legal principles developed by the decisions of Courts and those principles remain the life-blood of the statutes. The observation of Lord Diplock in The Jade (1976) 1 All. E.R.920, on which much reliance is placed by Mr. Ramachandran in support of his arguments, has to be so understood. (See also Halsbury's Laws of England, Vol. 1, para 307).

62. Remedy for enforcement of maritime liens was available prior to the introduction of statutes. "Admiralty law was derived from the laws of Oleron, supplemented by the civil law" Per Lord Halsbury, L.C; Currie v. M. Knight (1897) AC 97. For a long time the Admiralty Court developed the law independently fighting its battles with the Common Law Courts on the question of jurisdictional boundaries. By statutory intervention the court structure came to be unified and substantive rights and remedies became available without regard to jurisdictional boundaries. Although statutes now control the field, much of the admiralty law is rooted in judicial decisions and influenced by the impact of civil law, common law and equity. The ancient maritime codes like the Rhodian Sea Law, the Basilika, the Assizes of Jerusalem, the Rolls of Oleron, the Laws of Visby, the Hanseatic Code, the Black Book of the British Admiralty, Consolato del Mare, and others are, apart from statutes, some of the sources from which the law developed in England. Any attempt to confine admiralty or maritime law within the bounds of statutes is not only unrealistic but incorrect. Although this branch of the law in England is now governed generally by statutes, the law in all its aspects can be understood only by viewing it in the context of decisions of courts and the general principles which are common to common law and equity.

63. Unlike in the "civil law countries", there is no maritime code in England containing all aspects of maritime law. The Merchant Shipping Acts and the Carriage of Goods by Sea Act contain the substantive rules, but the jurisdictional and other aspects of maritime claims have to be traced to numerous other statutes and sources. English Maritime Law is still composed of rules having their roots in statute, rules of court and judicial doctrine of Admiralty, common law and equity'. (See D.C. Jackson, Enforcement of Maritime Claims, 1985, p.9). See also Halsbury, op. cit.. Vol. (1), para 307. As Christopher Hill puts it: "...Britain is a common law country and that Admiralty law has been superimposed over the years by various statutory enactments from time to time. The right to seize a vessel by legal process is therefore partly based on rights conferred by general maritime law and partly upon the right to take legal action of this nature granted by statute...". Maritime Law, 2nd ed.p.93.

64. In tracing the history of admiralty law in India, it is likewise misleading and incorrect to confine it to statutes. Statutes have been codifications of rules of law as developed by usage, practice and custom. As stated by Westropp, C.J., of the Bombay High Court in Bardot and Anr. v. The American Ship Or Vessel 'Augusta' 1873(X) Bombay High Court Reports, 110 at p.113:

> ...If we have jurisdiction to entertain this suit, it must be sought for in the general maritime law administered by Courts of Admiralty...

> ...We must hold it to be quite clear that the Statutes 3 & 4 Vict. c. 65 (1840), 24 Vict. c. 10 (1861), and 26 & 27 Vict. c. 24 (1863), do not

increase or in any wise affect our jurisdiction either in Admiralty or Vice-Admiralty, and that if we have jurisdiction to entertain this cause, that jurisdiction must be sought for outside those Statutes.

65. Where statutes are silent and remedy has to be sought by recourse to basic principles, it is the duty of the court to devise procedural rules by analogy and expediency. Actions in rem, as seen above, were resorted to by courts as a device to overcome the difficulty of personal service on the defendant by compelling him to enter appearance and accept service of summons with a view to furnishing security for the release of the res', or, in his absence, proceed against the res itself, by attributing to it a personality for the purpose of entering a decree and executing the same by sale of the res. This is a practical procedural device developed by the courts with a view to rendering justice in accordance with substantive law not only in cases of collision and salvage, but also in cases of other maritime liens and claims arising by reason of breach of contract for the hire of vessels or the carriage of goods or other maritime transactions, or tortious acts, such as conversion or negligence occurring in connection with the carriage of goods. Where substantive law demands justice for the party aggrieved, and the statute has not provided the remedy, it is the duty of the court to devise procedure by drawing analogy from other systems of law and practice. To the courts of the "civil law countries" in Europe and other places, like problems seldom arise, for all persons and things within their territories (including their waters) fall within their competence to deal with. They do not have to draw any distinction between an action in rem and an action in personam.

66. It is likewise within the competence of the appropriate Indian Courts to deal, in accordance with the general principles of maritime law and the applicable provisions of statutory law, with all persons and things found within their jurisdiction. The power of the court is plenary and unlimited unless it is expressly or by necessary implication curtailed. Absent such curtailment of jurisdiction, all remedies which are available to the courts to administer justice are available to a claimant against a foreign ship and its owner found within the jurisdiction of the concerned High Court. This power of the court to render justice must necessarily include the power to make interlocutory orders for arrest and attachment before judgment.

67. The High Courts in India are superior courts of record. They have original and appellate jurisdiction. They have inherent and plenary powers. Unless expressly or impliedly barred, and subject to the appellate or discretionary jurisdiction of this Court, the High Courts have unlimited jurisdiction, including the jurisdiction to determine their own powers. (See Naresh Shridhar Mirajkar and Ors. v. State of Maharashtra and Anr. MANU/SC/0044/1966. As stated in Halsbury's Laws of England, 4th edition, Vol.10, para 713:

> Prima facie, no matter is deemed to be beyond the jurisdiction of a superior court unless it is expressly shown to be so, while nothing is within the jurisdiction of an inferior court unless it is expressly shown on the face of the proceedings that the particular matter is within the cognizance of the particular court.

68. The observation of this Court in Raja Soap Factory and Ors. v. S.P. Shantharaj and Ors. MANU/SC/0231/1965, that Section 151 of the Code of Civil Procedure did not confer on the High Court jurisdiction which was not specifically vested was made in the context of Section 105 of the Trade and Merchandise Marks Act (43 of 1958) which conferred a specific jurisdiction in respect of a passing off action. That observation is not relevant to the question regarding the inherent and plenary jurisdiction of the High Court as a superior court of record. The Andhra Pradesh High Court, as a successor to the Madras High Court, is vested with all the appellate and original jurisdiction, including admiralty jurisdiction to order the arrest and detention of a ship.

69. In decisions such as Jayaswal Shipping Company v. 'S.S. Leelavati MANU/WB/0142/1954; Kamalakar Mahadev Bhagat v. Scindia Steam Navigation Co. Ltd,, Bombay MANU/MH/0046/1961; Rungta Sons Private Ltd, and Anr. v. S.S. 'Edison Mariner' and Anr. 1961-62 (66) Calcutta Weekly Notes 1083; National Co, Ltd. v. Asia Mariner 1967-88 (72) Calcutta Weekly Notes 635; Mrs. Sahida Ismail v. Petko R. Salvejkov and Ors. MANU/MH/0051/1973 and Smt. Reena Padhi v. 'Jagdhir'. MANU/OR/0019/1982, the High Courts took an unduly restrictive view of the courts' admiralty jurisdiction by limiting it to what was permitted by the Admiralty Court Act, 1861 and the Colonial Courts of Admiralty Act, 1890. This was, in our view, an unjustified abdication of jurisdiction and a self-assumed fetter on competence to render justice.

70. In equating the admiralty jurisdiction of the Indian High Court to that of the English High Court, the Colonial Court of Admiralty Act, 1890 significantly refers to the admiralty jurisdiction of the High Court in England 'whether existing by virtue of any statute or otherwise'. This is an enabling statute, and not a statute of limitation of power. It aids, and does not fetter, the growth of jurisdiction. There is no reason why the words 'statute or otherwise' should be so construed as to exclude the various sources from which the admiralty jurisdiction in England developed. Apart from statutes, the powers of that Court, as seen above, were derived from custom and practice and the principles developed by common law and equity as well as by the generally recognised principles of civil law. developed and practised in Europe. There is no reason, as rightly stated by Westropp. C.J. of the Bombay High Court in Bardot (supra), why the expression 'statute or otherwise' should be so construed s to exclude all these vast areas of legal principles which enriched and strengthened the maritime laws of England. Likewise, there is no reason why those principles should also not be drawn upon to enrich and strengthen the jurisprudence of this country, even if the jurisdiction of our courts were to be, by compulsions of history, considered to be curtailed and dovetailed to the colonial past - a proposition which is neither correct nor consistent with our status as a sovereign republic. It is time to take a fresh look at the old precedents.

71. In this connection we would refer to the recent decision of this Court in Delhi Judicial Service Association, Tis Hazari Court, Delhi v. State of Gujarat and Ors. MANU/SC/0478/1991. This Court stated:

> ...The Constitution has assigned a new role to the Constitutional Courts to ensure rule of law in the country... Time has come to have a fresh look at the old precedents and to lay down law with the changed perceptions keeping in view the provisions of the Constitution....

See also S.P. Gupta v. Union of India MANU/SC/0080/1981

72. It is well recognised in international law that a merchant ship, though generally governed by the laws of the flag State, subjects itself to the jurisdiction of a foreign State as it enters its waters. The Geneva Convention on the Territorial Sea and the Contiguous Zone, 1958 and the Law of the Sea Convention, 1982 affirm that the sovereignty of a State extends over its internal and territorial waters.[11]

73. "A foreign vessel, no matter what flag she flies, owes temporary and local allegiance to the sovereign of any port to which she comes. And the persons in such a vessel likewise must obey the laws and regulations of the port. Such jurisdiction is discretionary. Once a foreign vessel passes out of territorial waters, she owes no further duty to the place which she has left, unless she is 'hotly pursued'. But her conduct on the high seas or in foreign ports may subject her to penalties on returning on a subsequent visit." (Benedict, The Law of American Admiralty, Sixth Edition, pages 121 & 122).

74. In the words of Chief Justice Marshal of the United States Supreme Court "it would be obviously inconvenient and dangerous to society and would subject the laws to continual infraction, and the government to degradation, if such (alien) individuals or merchants (trading in ships) did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country." [The Schooner Exchange v. M. Faddon and Ors. (1812) 11 U.S. (7 Cranch) 114, 143.]

75. All foreign merchant ships and persons thereon fall under the jurisdiction of a coastal State as they enter its waters, Subject to the right of 'innocent passage', the coastal State is free to exercise jurisdiction over such ships in respect of matters the consequences of which extend beyond the ships. Such ships are subject to the local jurisdiction in criminal, civil and administrative matters. This jurisdiction is, however, assumed only when, in the opinion of the local authorities, the peace or tranquillity of the port is disturbed, when strangers to the vessel are involved or when the local authorities are appealed to. Questions which affect only the internal order and economy of the ship are generally left to the authorities of the flag State. Coastal States are entitled to assume jurisdiction in respect of maritime claims against foreign merchant ships lying in their waters. These ships are liable to be arrested and detained for the enforcement of maritime claims. The courts of the country in which a foreign ship has been arrested may determine the cases according to merits, provided they are empowered to do so by the domestic law of the country or in any of the cases recognised by the International Convention relating to the Arrest of Seagoing Ships, Brussels, 1952.[12] The maritime claims in respect of which the power of arrest is recognised in law include claims relating to damage caused by any ship either in collision or otherwise; claims relating to carriage of goods in any ship whether by charter party or otherwise, loss of or damage to goods etc. These principles of international law, as generally recognised by nations, leave no doubt that, subject to the local laws regulating the competence of courts, all foreign ships lying within the waters of a State, including waters in ports, harbours, roadsteads, and the territorist waters, subject themselves to the jurisdiction of the local authorities in respect of maritime claims and they are liable to be arrested for the enforcement of such claims.

76. In India, carriage of goods by sea is governed by the Indian Bills of Lading Act, 1856, the Indian Carriage of Goods by Sea Act, 1925, the Merchant Shipping Act, 1958, and general statutes, such as the Marine Insurance Act, 1963, the Contract Act, 1872, the

Evidence Act, 1872, the Indian Penal Code, 1860, the Transfer of Property Act, 1882, the Civil Procedure Code, 1908, the Criminal Procedure Code, 1973, the Companies Act, 1956, etc. etc. as well as the general principles of law such as the law of tort, public and private international law etc. In this connection, reference may also be made to the Indian Ports Act, 1908 and the Major Port Trusts Act, 1963 concerning the administration of the port and the jurisdiction over ships in port, the Customs Act, 1962 containing various regulatory measures affecting ships, goods and persons in connection with importation or exportation of goods, as well as the provisions governing employment of labour. The Indian Bills of Lading Act, 1856 emphasises the negotiable and other characteristics of a bill of lading. The Carriage of Goods by Sea Act, 1925, contains the Hague Rules regulating the respective rights and liabilities of the parties to a contract governed by bills of lading or similar documents of title for carriage of goods by sea "from any port in India to any other port whether in India or outside India". The Merchant Shipping Act embodies rules regarding registration of Indian ships; transfers or mortgages of ships or shares; national character and flag; employment of seamen; safety, nuclear ships; collisions, accidents at sea and liability; limitation of liability; navigation; prevention of pollution; investigation and enquiries; wreck and salvage; coasting trade; sailing vessels; penalties and procedure, etc. May of these provisions have been adopted from rules formulated by various international conventions.

It is true that Indian statutes lag behind the development of international law in comparison to contemporaneous statutes in England and other maritime countries. Although the Hague Rules are embodied in the Carriage of Goods by Sea Act, 1925, India never became a party to the International Convention laying down those rules (International Convention for the Unification of Certain Rules of Law relating to Bills of Lading, Brussels 1924). The Carriage of Goods by Sea Act, 1925 merely followed the (united Kingdom) Carriage of Goods by Sea Act, 1924. The United Kingdom repealed the Carriage of Goods by Sea Act, 1924 with a view to incorporating the Visby Rules adopted by the Brussels Protocol of 1968. The Hague-Visby Rules were accodingly adopted by the Carriage of Goods by Sea Act, 1971 (United Kingdom). Indian legislation has not, however, progressed, notwithstanding the Brussels Protocol of 1968 adopting the Visby Rules or the United Nations Convention on the Carriage of Goods by Sea, 1978 adopting the Hamburg Rules. The Hamburg Rules prescribe the minimum liabilities of the carrier far more justly and equitably than the Hague Rules so as to correct the tilt in the latter in favour of the carriers. The Hamburg Rules are acclaimed to be a great improvement on the Hague Rules and far more beneficial from the point of view of the cargo owners. India has also not adopted the Intematipnal Convention relating to the Arrest of Sea-going Ships, Brussels, 1952. Nor has India adopted the Brussels Conventions of 1952 on civil and penal jurisdiction in matters of collision; nor the Brussels Conventions of 1926 and 1967 relating to maritime liens and mortgages[13]. India seems to be lagging behind many other countries in ratifying and adopting the beneficial provisions of various conventions intended to facilitate international trade. Although these conventions have not been adopted by legislation, the principles incorporated in the conventions are themselves derived from the common law of nations as embodying the felt necessities of international trade and arc as such part of the common law of India and applicable for the enforcement of maritime claims against foreign ships.

77. The Merchant Shipping Act, 1958 contains various provisions to enforce territorial jurisdiction. The Act being essentially regulatory in character, the various authorities, tribunals and Courts entrusted with the administration and enforcement of its provisions are specifically stated. The High Court is defined under Section 3(15) as follows:

> 3(15). 'High Court', in relation to a vessel, means the High Court within the limits of whose appellate jurisdiction-
>
> > (a) the port of registry of the vessel is situate:
> >
> > (b) the vessel is for the time being: or
> >
> > (c) the cause of action wholly or in part arises;

Accordingly, a foreign ship falls within the jurisdiction of the High Court where the vessel happens to be at the relevant time - i.e., at the time when the jurisdiction of the High Court is invoked, or, where the cause of action wholly or in part arises.

78. The detention of a foreign ship is authorised in terms of sections 443 and 444. In view of their vital significance in the enforcement of maritime jurisdiction, we shall read these two sections in full. Section 443 defines the character and scope of the power of detention:

> Section 443. Power to detain foreign ship that has occasioned damage. - (1) Whenever any *damage* has in any part of the world been *caused* to property belonging to the Government or to any citizen of India or a company *by a ship* other than an Indian ship and at any time thereafter that ship is found within Indian jurisdiction, the High Court may, upon the application of any person who alleges that the damage was caused by the misconduct or want of skill of the master or any member of the crew of the ship, issue an order directed to any proper officer or other officer named in the order requiring him to detain the ship until such time as the owner, master or consignee thereof has satisfied any claim in respect of the damage or has given security to the satisfaction of the High Court to pay all costs and damages that may be awarded in any legal proceedings that may be instituted in respect of the damage, and any officer to whom the order is directed shall detain the ship accordingly.
>
> (2) Whenever it appears that before an application can be made under this section, the ship in respect of which the application is to be made will have departed from India or the territorial waters of India, any proper officer may detain the ship for such time as to allow the application to be made and the result thereof to be communicated to the officer detaining the ship, and that officer shall not be liable for any costs or damages in respect of the detention unless the same is proved to have been made without reasonable grounds.

(3) In any legal proceedings in relation to any such damage aforesaid, the person giving security shall be made a defendant and shall for the purpose of such proceedings be deemed to be the owner of the ship that has occasioned the damage.

(emphasis supplied)

The power of enforcement of an order of detention of a foreign ship is dealt with by Section 444.

Section 444. Power to enforce detention of ship. - (1) Where under this Act a ship is authorised or ordered to be detained, any commissioned officer of the Indian Navy or any port officer, pilot, harbour master, conservator of port or customs collector may detain the ship.

(2) If any ship after detention, of after service on the master of any notice of, or order for, such detention proceeds to sea before she is released by competent authority, the master of the ship shall be guilty of an offence under this sub-section.

(3) When a ship so proceeding to sea takes to sea, when on board thereof in the execution of his duty any person authorised under this Act to detain or survey the ship, the owner, master or agent of such ship shall each be liable to pay all expenses of, and incidental to, such person being so taken to sea and shall also be guilty of an offence under this sub- section.

(4) When any owner, or master or agent is convicted of an offence under Sub-section (3), the convicting magistrate may inquire into and determine the amount payable on account of expenses by such owner, master or agent under that sub-section and may direct that the same shall be recovered from him in the manner provided for the recovery of fines.

These provisions relate to detention by reason of damage caused in any part of the world by a foreign ship to property belonging to the Government of India or to an Indian citizen or company. The sections are wide in terms and the expression 'damage' is not necessarily confined to physical damage. Ordinarily damage is caused by physical contact of the ship, such as in collision. But damage can also be caused to property by breach of contract or acts of commission or omission on the part of the carrier or his agents or servants by reason of the negligent operation and management of the vessel, as, for example, when cargo is damaged by exposure to weather or by negligent stowage; or, by the misconduct of those in charge of the ship, like when cargo is disposed of contrary to the instructions of the owner or by reason of theft and other misdeeds. In all these cases, damage arises by reason of loss caused by what is done by the snip or by the breach, negligence or misdeeds of those in charge of the ship. It must however be noticed that the expression 'damage done by any ship' has been construed by the English Courts as not to apply to claims against the carrying ship for damage done to cargo. In the Victoria 1887

12 PD 105, the Court so construed Section 7 of the Admiralty Court Act, 1861 (24 Victorine c.10).[14] It has been held to apply only to physical damage done by a ship by reason of its coming into contact with something. See The Vera Cruz, (1884) 9 PD 96; Currie v. M. Knight (1897) AC 97 and The Jade, (1976)1 All.E.R. 920. In view of the specific provisions of the English statutes of 1920, 1925, 1956 and 1981, it was unnecessary for the English Courts to construe the expression broadly so as to include cargo claims and the like. The last two enactments contain an exhaustive list of maritime claims and questions in regard to which the High Court can exercise jurisdiction over any merchant ship by arresting it as it enters the waters of Britain. This power, as already noticed, is available, whatever be the nationality of the ship or its owner or the domicile or place of residence or business of the owner, or wherever the cause of action has arisen. About the words 'damage done by a ship' in Section 7 of the Admiralty Court Act, 1861 and the decision in The Victoria (1887) 12 PD 105 to the effect that the section had no application to claims against the carrying ship for damage to cargo, the following observation significantly appears in Halsbury's Laws of England, 4th ed, Vol. 1(1), para 319 N. 12.

> ... but this question is academic in the light of the fact that jurisdiction in respect of claims for damage to cargo carried in a ship is now expressly given by the Supreme Court Act, 1981 Section 20(2)(g).

79. In the absence of any statute in India comparable to the English statutes on admiralty jurisdiction, there is no reason why the words 'damage caused by a ship" appearing in Section 443 of the Merchant Shipping Act, 1958 should be so narrowly construe as to limit them to physical damage and exclude any other damage arising by reason of the operation of the vessel in connection with the carnage of goods. The expression is wide enough to include all maritime questions or claims. If goods or other property are lost or damaged, whether by physical contact or otherwise, by reason of unauthorised acts or negligent conduct on the part of the shipowner or his agents or servants, wherever the cause of action has arisen, or wherever the ship is registered, or wherever the owner has his residence or domicile or place of business, such a ship, at the request of the person aggrieved, is liable to be detained when found within Indian jurisdiction by recourse to sections 443 and 444 of the Merchant Shipping Act, 1958 read with the appropriate rules of practice and procedure of the High Court. These procedural provisions are but tools for enforcement of substantive rights which are rooted in general principles of law, apart from statutes, and for the enforcement of which a party aggrieved has a right to invoke the inherent jurisdiction of a superior court.

80. The Indian Carriage of Goods by Sea Act, 1925 applies to carriage of goods by sea under bills of lading or similar documents of title from a port in India to any other port whether in or outside India. (See Section 2). The Act imposes certain responsibilities and liabilities and confers certain rights and immunities upon the carrier (see Articles III & IV). In respect of a claim relating to an outward cargo, the cargo owner has a right to bring a suit against a shipowner subject to the period of limitation specified under the Act, namely, one year [Article III (6)]. The substantive rights recognised by the statute are of equal application to foreign merchant ships as they are to Indian merchant ships. The Carriage of Goods by Sea Act does not, however, contain any provision for the

enforcement of the right by arresting the foreign vessel found in Indian waters. In the absence of arrest, no effective remedy against a foreign owner may be available to the cargo owner. The same is the position with regard to claims relating to cargo carried under a charterparty. It is, therefore, necessary that he should have recourse to the remedy available to him under the Merchant Shipping Act. That Act, as stated earlier, confers a right to arrest a vessel in respect of any damage caused by a ship. If that expression, in the absence of any other more appropriate statute, is understood sufficiently broadly as an enabling provision to effectively assume jurisdiction over a foreign ship for the enforcement of a substantive right recognised by law, there would be no difficulty in finding a remedy for the right the law has conferred on the cargo owner.

81. The Merchant Shipping Act empowers the concerned High Court to arrest a ship in respect of a substantive right. A right conferred by the Indian Carriage of Goods by Sea Act, 1925 in respect of outward cargo is one of those rights which can be enforced by arrest and detention of the foreign ship in order to found jurisdiction over the vessel and its owners, just as it can be done in respect of inward cargo by reason of the substantive rights conferred by the Admiralty Court Act, 1961 read with the Colonial Courts of Admiralty Act, 1890, and other rules of law. The same principle must hold good for carriage under a charterparty. These and other laws, such as a the law of contract, tort, crime, mortgage, marine insurance, customs, port operations, etc., and the Civil and Criminal Procedure Codes as well as the relevant rules of court regulating procedure and practice together constitute the body of substantive and procedural laws governing claims relating to inward and outward cargo, and such claims are enforceable against foreign ships by recourse to arrest and detention when found within jurisdiction. Viewed in this light, and by this reasoning, the Andhra Pradesh High Court, as a successor to the Madras High Court, does not lack admiralty jurisdiction in respect of claims relating to outward cargo.

82. The admiralty jurisdiction of the High Court is dependent on the presence of the foreign ship in Indian waters and founded on the arrest of that ship. This jurisdiction can be assumed by the concerned High Court, whether or not the defendant resides or carries on business, or the cause of action arose wholly or in part, within the local limits of its jurisdiction. Once a foreign ship is arrested within the local limits of the jurisdiction of the High Court, and the owner of the ship has entered appearance and furnished security to the satisfaction of the High Court for the release of the ship, the proceedings continue as a personal action.

83. The Merchant Shipping Act, 1958 provides a detailed code of substantive and procedural rules regulating shipping as an industry and the control exercised over it by the competent authorities in conformity with various international conventions which have, under the auspices of International Organisations such as the IMO or the ILO, unified and developed various aspects of snipping laws. Conventions regulating sea traffic, safety of life at sea, employment of seamen, wages, hours of work, social security, etc. are cases in point. Likewise, the substantive rules concerning transport of goods are contained in the Indian Bills of Lading Act, 1856 and the Indian Carriage of Goods by Sea Act, 1925. But the jurisdictional questions concerning arrest of foreign ships for enforcement of claims against the shipowner as a transporter of goods, which in England are regulated by The Supreme Court Act, 1981, are in many respects left unregulated by Indian legislation. While the provisions of various international conventions concerning

arrest of ships, civil and penal jurisdiction in matters of collision, maritime liens and mortgages etc. have been incorporated into the municipal laws of many maritime States, India, as stated above, lags behind them in adopting these unified rules.[15] By reason of this void, doubts about jurisdiction often arise, as in the present case, when substantive rights, such as those recognised by the Carriage of Goods by Sea Act, are sought to be enforced. The remedy lies, apart from enlightened judicial construction, in prompt legislative action to codify and clarify the admiralty laws of this country. This requires thorough research and investigation by a team of experts in admiralty law, comparative law, and public and private international law. Any attempt to codify without such investigation is bound to be futile.

84. No Indian statute defines a maritime claim. The Supreme Court Act, 1981 of England has catalogued maritime claims with reference to the unified rules adopted by the Brussels Convention of 1952 on the Arrest of Seagoing Ships[16]. Although India has not adopted the various Brussels[17] Conventions, the provisions of these Conventions are the result of international unification and development of the maritime laws of the world, and can, therefore, be regarded as the international common law or transnational law rooted in and evolved out of the general principles of national laws, which, in the absence of specified statutory provisions, can be adopted and adapted by courts to supplement and complement national statutes on the subject. In the absence of a general maritime code, these principles aid the courts in filling up the lacunae in the Merchant Shipping Act and other enactments concerning shipping. "Procedure is but a handmaiden of justice and the cause of justice can never be allowed to be thwarted by any procedural technicalities." [S.P. Gupta v. Union of India MANU/SC/0080/1981

85. It is important to remember that the Brussels Convention on Arrest of Ships merely restricts or regulates the power of the coastal States and is not intended to confer power which they did not otherwise have as sovereign States. 'Arrest' to which the convention refers is detention of a ship to secure a maritime claim, and not seizure of a ship in execution or satisfaction of judgment.

86. The judicial power of this country, which is an aspect of national sovereignty, is vested in the people and is articulated in the provisions of the Constitution and the laws and is exercised by courts empowered to exercise it. It is absurd to confine that power to the provisions of imperial statutes of a bygone age. Access to court which is an important right vested in every citizen implies the existence of the power of the Court to render justice according to law. Where statute is silent and judicial intervention is required, Courts strive to redress grievances according to what is perceived to be principles of justice, equity and good conscience.

87. In the words of Chief Justice Marshall:

> The jurisdiction of courts is a branch of that which is possessed by the nation as an independent sovereign power. The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself....

The Schooner Exchange v. M' Fadaon and Ors. U.S. Supreme Court Reports, Cranch 5-9, p. 114, 133 (3 L.ed. 287).

88. Admiralty jurisdiction is an essential aspect of judicial soverignity which under the Constitution and the laws is exercised by the High Court as a superior court of record administering justice in relation to persons and things within its jurisdiction. Power to enforce claims against foreign ships is an essential attribute of admiralty jurisdiction and it is assumed over such ships while they are within the jurisdiction of the High Court by arresting and detaining them.

89. All persons and things within the waters of a State fall within its jurisdiction unless specifically curtailed or regulated by rules of international law. The power to arrest a foreign vessel, while in the waters of a coastal State, in respect of a maritime claim, wherever arising, is a demonstrable manifestation and an essential attribute of territorial sovereignty. This power is recognised by several international conventions[18]. These conventions contain the unified rules of law drawn from different legal systems. Although many of these conventions have yet to be ratified by India, they embody principles of law recognised by the generality of maritime States, and can therefore be regarded as part of our common law. The want of ratification of these conventions is apparently not because of any policy disagreement, as is clear from active and fruitful Indian participation in the formulation of rules adopted by the conventions, but perhaps because of other circumstances, such as lack of an adequate and specialised machinery for implementation of the various international conventions by co-ordinating for the purpose the concerned Departments of the Government. Such a specialised body of legal and technical experts can facilitate adoption of internationaly unified rules by national legislation. It is appropriate that sufficient attention is paid to this aspect of the matter by the concerned authorities. Perhaps the Law Commission of India, endowed as it ought to be with sufficient authority, status and independence, as is the position in England, can render valuable help in . this regard. Delay in the adoption of international conventions which are intended to facilitate trade hinders the economic growth of the nation.

90. The British statute assimilating Indian High Courts to the position of the English High Court in respect of admiralty jurisdiction is an enabling legislation and it is but one of the strands of jurisdiction vested in the High Court by virtue of the constitutional provisions. The jurisdiction of the High Court is governed by the Constitution and the laws, and the continuance in force of the existing laws is not a fetter but an additional source of power. Access to court for redressal of grievance being an important right of every person, it is essential that the jurisdiction of the courts is construed harmoniously and consistently with its vital function in that respect, so that absence of legislation will not jeopardise that right.

91. Admiralty jurisdiction, despite the peculiarities of its origin and growth - rooted as it is in history and nurtured by the growing demands of international trade - is nevertheless a part of the totality of jurisdiction vested in the High Court as a superior court of record, and it is not a distinct and separate jurisdiction as was once the position in England before the unification of courts. The 1890 and 1891 Acts specifically conferred admiralty jurisdiction on the Indian High Courts by reason of their being courts of unlimited jurisdiction. These Acts did not create any separate or distinct jurisdiction, but merely equated the Indian High Courts to the position of the English High Court (united and consolidated as that Court has been since 1875) for the exercise of admiralty powers within the jurisdiction of the former. The contrary view expressed in some of the decisions of the High Courts referred to earlier is clearly wrong.

92. Once a foreign ship is arrested in Indian waters by an order of the High Court, in exercise of the admiralty jurisdiction vested in it by statute, or inherent in it as a court of record, in respect of any maritime claim against its owner, wherever the cause of action may have arisen, and whether or not the ship is subsequently released by the owner furnishing security, proceedings must continue against the owner as in any other suit. The arrest of the vessel while in Indian waters by an order of the concerned High Court, as defined under the Merchant Shipping Act, 1958 [section 3(15)] attracts the jurisdiction of the competent court to proceed with the trial, as in the case of any other suit, as an action against the owner, and any decree obtained by the plaintiff is executable against any property of the owner available within jurisdiction, including the security furnished by him for release of the vessel.

93. All foreign ships entering Indian waters are presumed to know that they fall within the jurisdiction of this country during their stay here. The vessel in question was lying in the Port of Vishakapatnam when she was arrested in respect of a cause of action relating to cargo. The sole contention of the defendants as regards jurisdiction was that no High Court in India was invested with admiralty jurisdiction to order the arrest of the vessel in respect of a cause of action relating to outward cargo because Section 6 of the Admiralty Court Act, 1861 (read with the Colonial Courts of Admiralty Act, 1890) conferring admiralty jurisdiction on Indian High Courts confined it to 'claims for damage to cargo imported'. This contention, for the reasons we have stated, has no merits. The High Court, in our view, rightly assumed jurisdiction by the arrest of the vessel while it was lying in the port of Vishakapatnam.

94. The High Court of Andhra Pradesh undoubtedly possesses jurisdiction over claims relating to inward and outward cargo. In the circumstances, the preliminary objection to the jurisdiction of the Andhra Pradesh High Court was totally devoid of merits.

95. Accordingly, the appeal arising from SLP(C) No. 10542 of 1985 has to be dismissed. In the light of our order dated 28th August, 1991 allowing the Civil Appeal No. 3392 of 1991 filed by the 3rd defendant against the order of the High Court dismissing the petition for condonation of delay in presenting O.S.A.S.R. No. 39789 of 1988, the Transferred Case No. 27 of 1987 arising from the judgment of the learned Single Judge decreeing the plaintiff's suit and the 3rd defendant's appeal have to be heard and disposed of together on the merits, and the right forum for the purpose will be the High Court itself. In the circumstances, the Transferred Case No. 27 of 1987 has to be returned to the High Court.

**R.M. Sahai, J.**

96. Admirality jurisdiction, an unfamiliar branch of jurisprudence, was the subject matter of illuminating debate in this appeal directed against judgment of the Andhra Pradesh High Court. But what was surprising to hear, even, in 1991 was that the admirality jurisdiction exercised by the High courts in Indian Republic is still governed by the obsolete English Admirality Courts Act, 1861 (referred hereinafter as 'the Act') applied by (English) Colonial Courts of Admiralty Act, 1890 (in brief '1890 Act') and adopted by Colonial Courts of Admiralty (India) Act, 1891 (Act XVI of 1891). Yet there appeared no escape from it, notwithstanding its unpleasant echo in ears. The shock was still greater when it transpired that this state of affairs is due to lack of legislative exercise, even, when in wake of decision of this Court in State of Madras v. C.G. Menon and Ors.[19] that 'Article 372 of the Constitution cannot save this law (Fugitive Offenders Act 1881)*

because the grouping is repugnant, to the concept of a sovereign democratic republic. the Law Commission in its Fifth Report on British Statutes applicable to India went into detail on scope of Article 372 of the Constitution and observed that the British statutes which were expressly applicable to India because India was a, 'British possession' are still supposed to be applicable to India without any change in the context, therefore, it impressed upon the urgency as far back as 1957 to enact, 'own laws or the subject matter of those statutes where it is necessary to do so and take legislative action making it clear that these statutes are no longer applicable to India.' In pursuance of this recommendation exercise was undertaken and (The) British Statutes (Applicable to India) Repeal Act, 1960 (Act 57 of 1960) was enacted on 26th December 1960 repealing as man) as 259 statutes mentioned in the Schedule. But the Admiralty jurisdiction remained untouched In respect of Colonial Courts of Admirality Act the recommendation of the Commission was that, 'The necessary substantive provisions of the English Statute may be incorporated into our Act XVI of 1891 so as to make it the comprehensive Indian law relating to courts of admirality. Unfortunately nothing was done. Neither the law was made up-to-date and brought in line with international conventions on maritime law passed in 1952 etc. nor even the salient features of English law as amended by Administration of Justice Act, 1920, and 1956 were adopted. And rights and interests of citizen of the independent sovereign State continue to be governed by legislations enacted for colonies by the British Parliament. Various provisions in 1890 Act have been rendered not only anomalous but even derogatory to the sovereignty of the State. No further need be said except to express the hope that the unfortunate state of affairs shall be brought to end at the earliest.

97. Be that as it may the intricate issue of Admiralty jurisdiction of the Andhra Pradesh High Court a successor of High Court of Madras, to entertain a suit for arrest of a foreign ship for tort committed by the owner or master of the ship while carrying cargo outside India has to be decided on the law as it stands. Entire thrust of attack, against direction by the High Court for arrest of the foreign ship, was found on absence of any provision in 1861 Act empowering the High Court to exercise jurisdiction over any claim by the owner or consignee of India in respect of bill of lading of any goods carried out of any Indian port in any foreign ship. True sections 5 to 8 and 10 to 11 conferring jurisdiction on High Court of Admirality do not provide for it. Section 6 is confined to, 'any claim by the owner or consignee or assignee of any Bill of Lading of any goods carried into, any port in England or Wales in any ship (to be read as India by virtue of proviso to sub-section 3 of Section 2 of Colonial Courts of Admiralty Act 1890)** for damage done to the goods or any part thereof by the negligence or misconduct Of or any breach of duty'. But this Act had no application till 1890. Before it the High Court of Madras enjoyed Admiralty jurisdiction under the Madras Supreme Court Act, then Letters Patent of 1862 and 1865. Finally it came to be governed by 1890 Act, enacted, to amend, the law respecting to exercise of Admiralty jurisdiction in British possession.' It was under Sub-section (1) of Section 2 of this Act read with Section 2 of 1891 Act that the then Presidency High Courts, being courts of unlimited, civil jurisdiction, were declared court of Admiralty. Sub-section (2) of Section 2 of 1890 Act spelt out the jurisdiction of Admiralty courts. It reads as under:

(2) The jurisdiction of a Colonial Court of Admiralty shall, subject to the provisions of this Act, be over the like places, persons, matters, and things, as the Admiralty jurisdiction of the High Court in England, whether existing by virtue of any statute or otherwise, and the Colonial Court of Admiralty may exercise such jurisdiction in like manner and to as full an extent as the High Court in England, and shall have the same regard as that Court to international law and the comity of nations.

Each part of the sub-section is inclined towards expanding jurisdiction. It not only declared those over which the court could exercise jurisdiction but it also amplified the manner and extent of exercise of jurisdiction. It was made co-extensive with the jurisdiction exercised by the High Court in England. Use of the expression, 'existing by virtue of any Statute or otherwise', widened the operative field extending the limit and authority to exercise jurisdiction beyond any existing statute, to custom practice or in any other manner in which it could be exercised. It was recognition of wide jurisdiction exercised by the High Court of England.

98. What then was the jurisdiction that the Court of England exercised in 1890? The law of Admiralty was developed by English courts both as a matter of commercial expediency and due to equity and justice. Originally it was a part of common law jurisdiction, but the difficulty of territorial limitations, constraints of common law and the necessity to protect the rights and interests of its own citizens resulted in growth of maritime lien a concept distinct from common law or equitable lien as it represents a charge on maritime property of a nature unknown alike to the common law or equity. The Privy Council explained it as 'a claim or privilege upon a thing to be carried into effect by legal process.[20] Law was shaped by exercise of discretion to what appeared just and proper in the circumstances of the case. Jurisdiction was assumed for injurious act done on high seas and the scope was extended, 'not only to British subjects but even to aliens[21]'. Maritime law has been exercised all over the world by Maritime powers. In England it was part of Municipal law but with rise of Britain as empire the law grew and it is this law, that is, 'Maritime Law that is administered by the Admiralty Court[22]. From the Maritime law sprang the right known as Maritime lien ascribing personality to a ship for purposes of making good loss or damage done by it or its master or owner in tort or contract. In Englnd it grew and was developed in course of which its scope was widened from damage done by a ship to claims of salvor, wages, bottomrey, supply of necessaries and even to bills of lading. Its effect was to give the claimant a charge on res from the moment the lien arose which follows the res even if it changed hands. In other words a maritime lien represented a charge on the maritime property. The advantage which accrued to the maritime lienee was that he was provided with a security for his claim up to the value of the res. The essence of right was to identify the ship as wrongdoer and compel it by the arrest to make good the loss. Althugh the historical review in England dates back to the 14th Century but its statutory recognition was much later and 'maritime law came to jurisprudential maturity in the first half of the 19th Century'[23]. And the first statutory recognition of such right came in 1840 when the Admiralty Court Act of 1840 was enacted empowring the admiralty court to decide all questions as to the title or ownership of any ship or vessel or the procedure thereof remaining in the territory arising in any cause of possesion, salvage, damage, wages or bottomrey. By Clause (6) of the

Act jurisdiction was extended to decide all claims and demands whatsoever in the nature of salvage for services rendered to or damage received by any ship or sea going vessel or in the nature of towage or for necessaries supplied to any foreign ship or sea-going vessel and the payment thereof whether such ship or vessel may have been within the body of a country or. upon the high seas at the time when the services were rendered or damage received or necessary furnished in respect of such claims. But the most important Act was passed in 1861 which expanded power and jurisdiction of courts and held the field till it was replaced by Administration of Justice Act, 1920. The importance of the Act lay in introducing the statutory right to arrest the res on an action in rem. Section 35 of the 1861 Act provided that the jurisdiction by the High Court of Admiralty could be exercised either by proceedings in rem or proceedings in personam. "The essece of the rem in procedure is that 'res' itself becomes, as one might say, the defendant, and ultimately the 'res' the ship may be arrested by legal process and sold by the Court to meet the plaintiffs claim. The primary object, therefore, of the action in rem is to satisfy the claimant out of the res"[24]. If the 1840 Act was important for providing statutory basis for various types of claims then 1861 Act was a step forward in expanding the jurisdiction to claims of bill of lading. Section 6 of the Act was construed liberally so as to confer jurisdiction and the expression 'carried into any port was' was expanded to mean not only when the goods were actually carried but even if they were to be carried.[25] Further the section was interpreted as providing additional remedy for breach of contract[26] By the jurisdiction Act of 1873 the court of Admiralty was merged in high court of justice. Result was that it obtained jurisdiction over all maritime cases. Therefore, that was covered by enactments could be taken cognisance of in the manner provided in the Act but there was no bar in respect of any cause of action which was otherwise cognizable and arose in Admiralty. Section 6 of 1861 Act was confined to claim by the owner or consignee or assignee of any bill of lading of any goods carried into any port in England or Wales (to be read as India). But it did not debar any action or any claim by the owner or consignee or assignee of any bill of lading in respect of cargo carried out of the port. Even if there was no provision in 1861 Act, as such, the colonies could not be deprived under 1890 Act from exercising jurisdiction on those matters which were not provided by 1861 Act but could be exercised or were otherwise capable of being exercised by the High Court of England.' The theory was that all matters arising outside the jurisdiction of common law i.e. outside the body of a country were inside the jurisdiction of Admirality'[27]. "That this Court had originally cognisance of all transaction civil and criminal, upon the high seas, in which its own subjects were concerned, is no subject of controversy'[28]. To urge, therefore, that the Admiralty court exercising jurisdiction under 1890 Act could not travel beyond 1861 Act would be going against explicit language of the Statute. Even now, the Admiralty jurisdiction of the High Court of Justice in England is derived 'partly from Statute and partly from the inherent jurisdiction of Admiralty'[29]. Observations of Lord Diplock in The Jade[30] that Admiralty jurisdiction was statutory only have to be understood in the context they were made. By 1976 the statutory law on Admiralty had become quite comprehensive. Brother Thommen, J., had dealt with it in detail. Therefore, those observations are not helpful in deciding the jurisdiction that was exercised by the High Court in England in 1890.

99. From what has been narrated above it is apparent that law of Admiralty progressed gradually from ordinary courts, to courts of Admiralty and ultimately to High Court

commencing in commercial expediency, equity and justice and ending with statutory enactments covering entire field from collision on ships to cargo even. All this was existing when 1890 Act was enacted. But the statutes of 1840 and 1861 were not exhaustive and English courts could take cognizance for various wrongs either in tort or contract. Therefore when colonial courts were conferred jurisdiction it was not restricted or confined to statutes, as the power was being conferred on High Courts which were, then and even now, not only courts of unlimited civil jurisdiction but higher courts possessed of every jurisdiction which was not expressly or impliedly conferred on other courts. The word 'otherwise' literally means in a different way, Effect of its use in 1890 Act in law, was to confer not only statutory jurisdiction possessed of by English courts but all that which was being exercised or was capable of being exercised either under custom and practice or for sake of equity and justice. In the Iron Sides (supra) it was observed that Act of 1861 was passed not because the power or jurisdiction prior to it did not exist but no one ventured to exercise it. No such restriction was placed on exercise of power under 1890 Act. Rather the Act permitted exercise of it and that too to its fullest extent. This deliberate expansion of power and jurisdiction after existence of two statutes for nearly thirty years was founded on experience and necessity of arming the courts for every dispute that could arise relating to Admiralty jurisdiction, as the law on Admiralty was a growing law. Its development could not be stiffled by its very nature. It was with this intention that the Parliament used the word, 'otherwise' in 1890 Act. No word in a statute has to be construed as surplus-age. Nor it can be rendered ineffective or purposeless. Courts are required to carry out the legislative intent fully and completely. The two legislations of 1840 and 1861 took care of those actions which appeared to be settled till then. But they did not close the door for the growth of law. They were enacted to 'improve the Admiralty practice' as the jurisdiction which were conferred by the statutes were already being exercised. Action in personam or rem were not unknown. It was provided statutory base only. Statutes till 1920 in England were not creation of new rights but recognition of what was existing by practice or custom. It can thus be safely inferred that the jurisdiction to entertain a claim for tort or breach of contract by owner or master of ship while carrying cargo outside the port could be exercised or was capable of being exercised in 1890 by the High Court of England if occasion arose. The rationale of extending jurisdiction in Admiralty over cargo carried into the port has been existence of a right in owner or consignee arising out of contract or agreement entered between him and the master or owner of the ship. It was the enforcement of the right which was safeguarded by providing a remedy to arrest a ship if the goods were carried into any port. Same rationale applies to redress the owner of bill of lading if the master of the ship in breach of agreement entered into any port committed tort by acting against it in course of outward journey. Such breach would have been actionable and a suit could be filed in the court where agreement was entered. Basis of Maritime Law has been necessity to provide remedy for wrong done on high seas. Inclusion or expansion of jurisdiction was in relation to any cause which could have been cognisable under ordinary law, Bottomrey, salvage, seaman wages or towage are all causes for which action could be brought in court of law but their enforcement was rendered illusory with disappearance of the person beyond territorial waters. To overcome this difficulty this jurisdiction was created making it actionable against person and finally the res itself. What was basic was the existence of cause of action, arising out of tort or contract in relation to the master or

owner of the ship. Applying this test the cause of action arose in Indian territory and if the owner of the ship would have remained in this country a suit for breach of contract could have been filed. Therefore the owner of bill of lading was not precluded from approaching the Admiralty court for redress when the foreign ship which was guilty of violations appeared in India waters. On this construction the colonial courts could exercise the jurisdiction in respect of cargo going outside the port in exercise of jurisdiction under Act of 1890 not on statutes but as the High Court of England could exercise such power. Emphasis on absence of any instance in which English courts assumed jurisdiction in respect of goods carried out of English port was searching for existence of jurisdiction not in law but on precedent. Test is not whether the jurisdiction was ever exercised by English courts but whether it was capable of being exercised. If it could, then colonial courts were empowered to exercise it. Reliance was placed on Yuri Mara[31], a decision because of which the courts in Bombay and Calcutta got stuck, and could not see beyond 1861 Act. Distinction on facts, apart, the court was primarily concerned if the jurisdiction of colonial court expanded or disunited by change of jurisdiction of High Court of England by different enactments passed from time to time. Incidentally it was also observed that there was conflict for long even in England on advantage of extending the process in rem and if a port of call could be benefited by existence of a power in all and sundry to arrest vessels found within its limits. This observation cannot be construed as determinative of limited jurisdiction possessed by the courts. No effort was made in the decision to adjudicate upon the impact of the expression or 'even otherwise'. Rather it turned on impossibility of automatic extension of jurisdiction of colonial court to exercise power under the English law enacted subsequently because of the use of word 'existing' in 1890 Act. Without entering into the controversy if 1890 Act was a legislation by reference or by incorporation and their consequences, on which arguments were addressed in extenso, suffice it to say that in absence of any consideration of the expression 'otherwise' this Court does not find any difficulty in construing the expression as permissive of jurisdiction. Legislations may create a right or it may recognise one founded on custom or practice. Admiralty statutes in England fell in latter category. In such legislations the background of enactment, the necessity to codify it, the purpose sought to be achieved by it all become relevant. Admiralty jurisdiction in England was rooted in remote past. It developed and expanded with rise and growth of Britain and its recognition as a superior maritime power. Law and practice revolved round it. Right to proceed against owner of ship for wrongs done on high seas was accepted and followed. Statutes of 1840 and 1861 provided legislative base only. Viewed in the background of enactment of 1890 it would be too artificial to confine the exercise of power by the High Courts in Admiralty to what was contained in 1861 Act. Even otherwise for deciding the jurisdiction exercised by the High Court in India founded on jurisdiction exercised by the High Court of England it is not necessary to be governed by the decision given by English courts. Law develops by pragmatic approach to problems arising under an Act and not by abdication or surrender. 1890 Act is an unusual piece of legislation expansive in scope, wider in outlook, opening out the wings of jurisdiction rather than closing in. It's authority and power to exercise jurisdiction was linked with power exercised by the High Court in England, the width of which was not confined to statute but went deep into custom, practice, necessity and even exigency.

100. Law of 1890 apart, can the Indian High courts after 1950 be denied jurisdiction to arrest a foreign ship to satisfy the claim of owner of a bill of lading for cargo taken outside the country? Without entering into any comparative study of jurisdiction of High Court of England and the High courts in our country the one basic difference that exists today is that the English courts derive their creation, constitution and jurisdiction from Administration of Justice Act or Supreme Court Act but the High Courts in our country are established under the Constitution. Under it Article 225 preserved the jurisdiction, including inherent jurisdiction, which existed on the date the Constitution came into force and Article 226 enlarged it by making it not only a custodian of fundamental rights of a citizen but as repository of power to reach its arms to do justice. A citizen carrying on business which is a fundamental right cannot be rendered helpless on premise that the jurisdiction of High Courts stood frozen either under • statute of England or any custom or practice prevailing there or the High Court of England cannot exercise the jurisdiction. Brother T.K. Thommen, J., while dealing with right of rem and in personam has considered the justification for conferment of such right to a claimant in respect of a merchant ship travelling from port to port. Can it be successfully urged today that such a ship or its master and owner is immune from tort or breach of contract committed • by him in respect of cargo taken out of port. A citizen of a colonial State may or may not but a citizen of an independent republic cannot be left high and dry. The construction of law has to be in consonance with sovereignty of a State. The apprehension that assumption of such jurisdiction would be on general attributes of sovereignty is not well founded. This coupled with expansive jurisdiction that the High Courts enjoyed in relation to Admirality under 1890 Act preserved under Article 225 provided justification for direction to arrest the ship, for the tortuous act done by master or owner of the ship in respect of goods carried outside the port even if there was no specific provision like Section 6 of the 1861 Act. Entertaining a claim arising out of breach of contract in relation to cargo taken out of any Indian port pertains to jurisdiction. It must arise out of Statute. But the power to direct arrest of a ship in exercise of the jurisdiction is one relating to competency. The High Courts in India being courts of unlimited jurisdiction, repository of all judicial power under the Constitution except what is exclused are competent to issue directions for arrest of foreign ship in exercise of statutory jurisdiction or even otherwise to effectute the exercise of jurisdiction. Since the jurisdiction to entertain a suit on tort or contract in relation to cargo going out of the country in a ship is found to exist under 1890 Act the High Court of Andhra Pradesh was competent to direct arrest of the foreign ship when it appeared in Indian waters. The High Court, therefore, rightly negatived the objection to issue direction to arrest the ship.

101. Necessity to add few words to the opinion of brother Thommen, J., arose without narrating facts or extracting sections as they have been dealt in detail by him, both to impress upon the urgency of enacting up-to-date law on Admiralty and to express agreement only on scope of 1890 Act as well as the extensive jurisdiction enjoyed by High courts after 1950.

## ORDER

1. For the reasons stated by us in our separate but concurring judgments dated 26.2.1992, we dismiss the appeal arising from SLP(C) No. 10542 of 1985. The Transferred Case No. 27 of 1987 is returned to the Andhra Pradesh High Court to be heard and disposed of on the merits together with the 3rd defendant's appeal O.S.A.S.R. No. 39789 of 1988.

2. We make no order as to costs.

[1] The other Courts are: (a) The Court of the Recorder of Rangoon; (b) The Court of the Resident at Aden; (c) The District Court of Karachi.

[2] A History of English Law. W.S. Holdsworth, Vol. 1, pp.558-59.

[3] The Gaetano an Maria, (1882) 7 PD at p. 143.

[4] The Gas Float Whitton, N:2 (1896) P. at pp. 47, 48.

[5]. The section reads:

> 6. As to Claims for Damage to Cargo imported. – The High Court of Admiralty shall have jurisdiction over any Claim by the Owner or Consignee or Assignee of any Bill of Lading of any Goods carried into any Port in England or Wales in any Ship, for Damage done to the Goods or any Part thereof by the Negligence or Misconduct of or for any Breach of Duty or Breach of Contract on the Part of the Owner, Master, or Crew of the Ship, unless it is shown to the satisfaction of the Court that at the time of the Institution of the Cause any Owner or Part Owner of the Ship is domiciled in England or Wales: Provided always, that if in any such Cause the Plaintiff do not recover Twenty Pounds he shall not be entitled to any Costs, Charges, or Expenses incurred by him therein, unless the Judge shall certify that the Cause was a fit one to be tried in the said Court."(emphasis supplied). See the observation of Dr. Lushington in the "Kasan" (January 13, 1863) and in the "Bahia" (April 21, 1863) English Report, Vol. 167, p. 268, 298.

[6] The specific questions and claims enumerated in Sub-section (2) of Section 20 of the Supreme Court Act, 1981 are:

> (a) any claim to the possession or ownership of a ship or to the ownership of any share therein;
>
> (b) any question arising between the co-owners of a ship as to possession, employment or earnings of that ship;
>
> (c) any claim in respect of a mortgage of or charge on a ship or any share therein;
>
> (d) any claim for damage received by a ship;
>
> (e) any claim for damage done by a ship;
>
> (f) any claim for loss of life or personal injury sustained in consequence of any defect in a ship or in her apparel or equipment, or in consequence of the wrongful act, neglect or default of-
>
>> (i) the owners, charterers or persons in possession or control of a ship; or

(ii) the master or crew of a ship, or any other person for whose wrongful acts, neglects or defaults the owners, chatterers or persons in possession or control of a ship are responsible, being an act, neglect or default in the navigation or management of the ship, in the loading, carriage or discharge of goods on, in or from the ship, or in the embarkation, carriage or disembarkation of persons on, in or from the ship.

(g) any claim for loss of or damage to goods carried in a ship;

(h) any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship;

(i) any claim in the nature of salvage (including any claim arising by virtue of the application, by or under Section 51 of the Civil Aviation Act, 1949, of the law relating to salvage to aircraft and their apparel and cargo);

(j) any cairn in the nature of towage in respect of a ship or an aircraft;

(k) any claim in the nature of pilotage in respect of a ship or an aircraft;

(l) any claim in respect of goods or materials supplied to a ship for her operation or maintenance;

(m) any claim in respect of the construction, repair or equipment of a ship or in respect of dock charges or dues;

(n) any claim by a master or member of the crew of a ship for wages (including any sum allotted out of wages or adjudged by a superintendent to be due by way of wages);

(o) any claim by a master, shipper, charterer or agent in respect of disbursements made on account of a ship;

(p) any claim arising out of an act which is or is claimed to be a general average act;

(q) any claim arising out of bottomry;

(r) any claim for the forfeiture or condemnation of a ship or goods which are being or have been carried, or have been attempted to be carried, in a ship, or for the restoration of a ship or any such goods after seizure, or for droits of Admiralty.

---

[7] See the Principle stated in The Fehmam, (1958) 1 All E.R. 333.

[8] See Halsbury, op. cit. 4th ed. Vol. I(1) para 309.

[9] See also the editor's general note on 0.75, rule 5 on the practice of the English High Court.

[10] See D.C. Jackson, Enforcement of Maritime Claims, (1985) Appendix 5, p.437 et seq.

[11] See Nagendra Singh, International Maritime Law Conventions. British Shipping Laws, Vols. I to IV.

[12] See also the International Conventions for the Unification of Certain Rules relating to Maritime Liens and Mortgages of 10th April, 1926 and May 27, 1967).

[13] (a) International Convention relating to the Arrest of Seagoing Ships, Brussels, 10 May 1952 (IMC);

> (b) International Convention on Certain Rules concerning Civil Jurisdiction in Matters of Collision, Brussels, 10 May 1952 (IMC); (c) International Convention for the Unification of Certain Rules relating to Penal Jurisdiction in Matters of Collision, Brussels, 10 May 1952 (IMC); and (d) International Conventions for the Unification of Certain Rules of Law relating to maritime Liens and Mortgages, Brussels, 10 April 1926, and the Revised Convention on Maritime Lines and Mortgages, Brussels, 29 May 1967 (IMC).

[14] Section 7 reads: "The High Court of Admiralty shall have jurisdiction over any Claim for Damage done by any ship.

[15] See, for example, the Brussels Conventions listed above.
See also the Administration of Justice Act, 1956 and the Supreme Court Act, 1981 incorporating the international rules into English law.

[16] International Convention for the Unification of Certain Rules relating to the Arrest of Seagoing Ships, Brussels, May 10, 1952. Article 1 of this Convention reads:

> (1) "Maritime Claim" means a claim arising out of one or more of the following:

>> (a) damage caused by any ship either in collision or otherwise; (b) loss of life or personal injury caused by any ship or occurring in connection with the operation of any ship; (c) salvage; (d) agreement relating to the use or hire of any ship whether by charterparty or otherwise; (e) agreement relating to the carriage of goods in any ship whether by charterparty or otherwise; (f) loss of or damage to goods including baggage carried in any ship; (g) general average; (h) bottomry; (i) towage (j) pilotage; (k) goods or materials wherever supplied to a ship for her operation or maintenance; (1) construction, repair or equipment of any ship or dock charges and dues; (m) wages of Masters, Officers, or crew; (n) Master's disbursements, including disbursements made by shippers, charterers or agents on behalf of a ship or her owner, (o) disputes as to the title to

or ownership of any ship; (p) disputes between co-owners of any ship as to the ownership, possession employment or earnings of that ship; (q) the mortgage or hypothecation of any ship.

(2) "Arrest" means the detention of a ship by judicial process to secure a maritime claim, but docs not include the seizure of a ship in execution or satisfaction of a judgment.

(3) "Person" includes individuals, partnerships and bodies corporate, Governments, their Departments, and Public Authorities.

(4) "Claimant" means a person who alleges that a maritime claim exists in his favour.

[17] See the Conventions listed above.
[18] See the Conventions referred to above. See also Nagendra Singh, International Maritime Conventions, British Shipping Laws, Vol.4.
[19] 1955 (1) S.C.R. 280;
[*] Bracket supplied;
[**] Bracket supplied.
[20] The Bol Bucclcugh (1851)7 Moo.P.C. 267;
[21] The Hailey, L.R. 2 PC 193;
[22] Halsbury's Laws of England IVth Edn., Vol.1;
[23] Maritime Liens by D.R. Thomas.
[24] Maritime Law by Christopher Hill;
[25] The Ironsides, 167 English Reports 205, The St. Cloud, 167 English Reports 269, The Norway, 167 English Reports 347;
[26] The Ironsides, 167 English Reports 205.
[27+28] Carter History of English Courts (Lord Stowell in 'The Hercules'2 Dod.371).
[29] Hahbury's Laws of England IVth Edn. Vol.1.;
[30] The Jade 1976 (1) All Eng. Reports 921.
[31] 1927 Appeal Cases 906.